Michael S. Davis
Anthony I. Giacobbe, Jr.
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
(212) 223-0400

*Attorneys for Petitioner*
*American Home Assurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN HOME ASSURANCE COMPANY,<br><br>Petitioner,<br><br>- and -<br><br>CIRCLE L. ROOFING, INC.,<br><br>Respondent. | Case No.: 08 CIV 0874 (RJS)<br><br>**DECLARATION IN SUPPORT OF ORDER TO SHOW CAUSE** |

STATE OF NEW YORK,
COUNTY OF NEW YORK.

    ANTHONY I. GIACOBBE, JR., pursuant to 28 U.S.C. § 1746, declares:

    1.    I am an attorney admitted to practice before this Court and of counsel to Zeichner Ellman & Krause LLP, attorneys for Petitioner American Home Assurance Company, on behalf of itself and each of the related insurers that provided coverage to respondent ("American Home"). I make this Declaration in support of

American Home's request for an Order to Show Cause to compel Respondent to arbitrate the disputes asserted in the Complaint.[1]

       2.      Submitted herewith is American Home's petition (the "Petition") to compel arbitration of the disputes alleged in the Complaint, together with a Memorandum of Law in support thereof.

       3.      Annexed to the Petition are the following exhibits:

      (A)      Insurance Program Agreements effective November 1, 2004;

      (B)      Insurance Program Agreements effective January 26, 2006;

      (C)      Insurance Program Agreements effective November 1, 2006;

      (D)      Complaint dated December 31, 2007, served by Respondent;

      (E)      Preliminary Injunction Motion dated January 22, 2008, served by Respondent; and

      (F)      Motion to stay the Florida action dated January 23, 2008, served by American Home.

---

[1]     Capitalized terms herein have the defined same meaning as set forth in the Petition.

(G)    Order of the United States District Court for the Middle District of Florida, Tampa Division, dated January 24, 2008.

4.    These exhibits show that this dispute is subject to arbitration and the arbitrators "shall have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability."

## REASON FOR MOVING BY ORDER TO SHOW CAUSE

5.    American Home moves by order to show cause for two reasons.

6.    First, Section 4 of the Federal Arbitration Act (9 U.S.C. § 4) provides that a motion to compel arbitration be heard on five days' notice.

7.    Second, Respondent has commenced a lawsuit and moved for a preliminary injunction in Florida. American Home filed a motion to stay that action pending a decision by this Court on this application, and thereafter the Florida District Court issued an order directing Respondent to respond by February 7, 2008 to the motion for a stay. Accordingly, American Home's motion to compel arbitration should be heard in this Court before any further proceedings take place in the Florida action.

## <u>NO PRIOR APPLICATION</u>

8.    No prior application has been made for the relief requested herein.

9.    I declare under penalties of perjury that the foregoing is true and correct.

Dated:    January 24, 2008

By:    ____/s/ Anthony I. Giacobbe, Jr._____
ANTHONY I. GIACOBBE, JR.

Michael S. Davis
Anthony I. Giacobbe, Jr.
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
(212) 223-0400

*Attorneys for Petitioner*
*American Home Assurance Company*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SULLIVAN

08 CV 0874

---

AMERICAN HOME ASSURANCE COMPANY,

                    Petitioner,

           - and -

CIRCLE L. ROOFING, INC.,

                    Respondent.

Case No.:

**PETITION TO
COMPEL ARBITRATION**

---

        Petitioner, American Home Assurance Company, on behalf of itself and each of the related insurers that provided coverage to Respondent ("American Home"), by its attorneys, Zeichner Ellman & Krause LLP, as and for its petition to compel Circle L. Roofing, Inc. ("Respondent") to arbitrate, avers upon information and belief, as follows:

        1.    This Court has subject matter jurisdiction over this matter due to the diversity of citizenship of the parties, under 28 U.S.C. § 1332(a)(1). It is a dispute between citizens of different states and the amount in controversy is more than $75,000.

2.      Petitioner American Home is an insurance company licensed under the laws of New York, with offices and principal places of business in the Southern District of New York.

3.      Upon information and belief, Respondent Circle L. Roofing, Inc. is a corporation organized and existing under the laws of Florida, with an office and principal place of business in Florida.

4.      Respondent is subject to the personal jurisdiction of this Court.

5.      Respondent expressly agreed that "any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York." See Exhibit A at A013.

6.      Beginning on November 1, 2004, American Home provided certain insurance coverages for the benefit of Respondent and its employees pursuant to an insurance program (the "Insurance Program").

7.      In connection with the Insurance Program, the parties entered into a Payment Agreement for Insurance and Risk Management Services effective as of November 1, 2004 (the "2004 Payment Agreement"). See Exhibit A at A001-A010.

8.      The Insurance Program was renewed effective as of January 26, 2006, and again on November 1, 2006, by the adoption of additional schedules and

2

agreements (together with the 2004 Payment Agreement, the "Insurance Program Agreements"), including the following:

- 2004 Addendum to Payment Agreement effective as of November 1, 2004 (the "2004 Addendum"). <u>See</u> Exhibit A at A011-A014.

- Payment Agreement for Insurance and Risk Management Services effective January 26, 2006 (the "2006 Payment Agreement"). <u>See</u> Exhibit B at B001-B010.

- 2004 Addendum to Payment Agreement effective as of January 26, 2006 (the "2006 Addendum"). <u>See</u> Exhibit B at B016-B018.

- 2006 Addendum to the Payment Agreement effective as of November 1, 2006 (the "2006 Renewal Addendum"). <u>See</u> Exhibit C at C006-C008.

9.    The 2004 Payment Agreement provides for arbitration of disputes pursuant to an Arbitration Clause (the "Arbitration Clause") which provides:

**HOW WILL DISAGREEMENTS BE RESOLVED?**

**What if we disagree about payment due?**

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- Give us written particulars about the items with which *You* disagree; and

- Pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. **<u>Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to</u>**

**arbitration** as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

**What about disputes other than disputes about payment due?**

**Any other unresolved dispute arising out of this Agreement must be submitted to arbitration.** *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

**Arbitration Procedures**

...

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *You* and we consent to an extension. The majority decision

of any two arbitrators, when filed with *You* and us will be final and binding on *You* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *You* to provide collateral to the extent required by this Agreement. **They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability**. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

**Expenses of Arbitration:** *You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

Exhibit A at A008-A009 (emphasis added). The 2004 Addendum provides:

**How arbitrators must be chosen:** You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a

court of competent jurisdiction in the City, County, and State of New York. **Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.**

See Exhibit A at A013 (emphasis added).

10.     Respondent filed a complaint, dated December 31, 2007 (the "Complaint"), in the United States District Court for the Middle District of Florida, Tampa Division (the "Florida District Court"), asserting claims for return of premium and security. Premium and security are expressly governed by the 2004 Payment Agreement containing the broad Arbitration Clause. A copy of the Complaint is annexed as Exhibit D.

11.     The disputes alleged in the Complaint are subject to the broad Arbitration Clause.

12.     After being advised of the arbitration agreements, Respondent refused to arbitrate and instead moved for a preliminary injunction. A copy of the Preliminary Injunction Motion is annexed as Exhibit E.

13.     On January 23, 2008, American Home filed a motion to stay the Florida action pending a determination by this Court as to arbitration. A copy of the motion to stay the Florida action is annexed as Exhibit F.

14.    On January 24, 2008, the Florida District Court issued an Order directing that "Plaintiff shall file a response to Defendants' Motion to Stay on or before February 7, 2008," and directing that "Defendants are relieved of the obligation to respond to Plaintiff's complaint or Plaintiff's Motion for Preliminary Injunction until the Court has resolved the Motion to Stay." A copy of the January 24, 2008 Order is annexed as Exhibit G.

15.    Moreover, to the extent Respondent disputes that the disputes alleged in the Complaint are subject to arbitration, the Arbitration Clause expressly provides that:   "They [the arbitrators] shall have exclusive jurisdiction over the entire matter in dispute, including any questions as to arbitrability." See Exhibit A at A009.

16.    No previous request has been made for the relief requested herein.

WHEREFORE, American Home respectfully requests that this Court compel Respondent to arbitrate the disputes asserted in the Complaint.

Dated:    New York, New York
          January 24, 2008

ZEICHNER ELLMAN & KRAUSE LLP

By: _____
        Michael S. Davis
        Anthony I. Giacobbe, Jr.
        Attorneys for Petitioner
        575 Lexington Avenue
        New York, New York 10022
        (212) 223-0400

517683.v3/10670-001/AIG

7

# EXHIBIT A

# PAYMENT AGREEMENT

For

## Insurance and Risk Management Services

effective on the 01 day of November, 2004

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company

And *You*, our Client

**CIRCLE L ROOFING INC**
**6320 VENTURE DR STE 205**
**BRADENTON FL 34202-5132**

in consultation with *Your* representative

**HOBBS GROUP INC**
**6771 Professional Parkway West**
**Sarasota FL 34240**

A001

# PAYMENT AGREEMEI

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your Payment Obligation*? | 4 |
| When Must *You* Pay *Your Payment Obligation*? | 4 |
| What Is the Payment Plan? | 4 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 7 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must *You* and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 9 |
| Are *You* Authorized to Make This Agreement? | 9 |
| Signatures | 10 |
| Schedule of Policies and Payments | Appended |

A002

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:

- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- us, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

We have agreed to the following:

- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,

*You* have agreed to the following:

- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any *Policies* and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. "ALAE" means Allocated Loss Adjustment Expense as defined in the *Policies*.

2. "Deductible Loss Reimbursements" means the portion of any *Loss* and ALAE we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.

3. "Loss" or "Losses" means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.

4. "Policy" or "Policies" means:

   - any of the insurance *Policies* described by their *Policy* numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement.

5. "Retained Amount" or "Retention" means one of the following:

   - Self-Insured Retention: the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - Deductible: the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - Loss Limit: the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

## PAYMENT AGREEMENT

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You" or "Your"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance *Policies* and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   • the premiums and premium surcharges,

   • *Deductible Loss Reimbursements,*

   • any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,

   • any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION*?

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance *Policies* and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to *You* whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance *Policies* to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the *Policy* year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to *You* under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement. A Credit Fee may be charged for any unsecured credit extended to *You*. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the *Policy* year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION*?

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## WHAT IS THE PAYMENT PLAN?

Edition 12/98 A

A004

# PAYMENT AGREEME

### Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

### Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

## WHAT IS THE BILLING METHOD?

**Deposit and Installments:** *You* must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the Direct Billing Method or the Automatic Withdrawal Method, or a combination of both. *Your* choice is shown in the *Schedule*.

### Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

### Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*. *You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your Retention* and *Your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

00/00/0000 808/02 9446013

A005

# PAYMENT AGREEMENT

## WHAT ABOUT COLLATERAL?

### Collateral is Required

*You* must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this *Agreement*, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance *Policies* or agreements to *Your Payment Obligation*.

### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation*. *You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*.

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this *Agreement* and the *Policies*. If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this *Agreement*. Nothing in those agreements will limit or modify any of our rights under this *Agreement*.

### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this *Agreement* applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*.

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity.

4. any material adverse change in the financial condition of *You*, *Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this *Agreement*.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

A006

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that You must provide us will be in the amount of the difference between the total unpaid amount of Your Payment Obligation and the total amount of Your collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the Policies on the basis of our evaluation of Your financial condition. If such difference is a negative sum, that sum is the amount that we will return to You. However, we are not obligated to return collateral to You if You are in default of any provision of this Agreement or any other similar agreement relating to Your primary casualty insurance with us.

## Financial Information

You must provide financial information to us as a basis for our collateral reviews within 14 days after our request. If You are not subject to the reporting requirements of the Securities and Exchange Act of 1934, You must provide us copies of Your audited annual financial statements.

If we so request, You must provide us such financial information as we may reasonably deem necessary to determine Your financial condition, including but not limited to copies of Your completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement,
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

## Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is a Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at Your option, provide us with the same notices at the same time that You provide such notices to any other creditor regarding any material financial or operational condition that You are obligated to report to such other creditor.

# WHAT IS DEFAULT?

Default is any of the following:

1. failure by You or any of Your subsidiaries or affiliates to perform within 5 days after its due date any obligation You or any of Your subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. Your insolvency, or the occurrence of any of the following:
   - the commencement of liquidation or dissolution proceedings, Your general failure to pay debts as they become due, general assignment by You for the benefit of creditors, the filing by or against You of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of Your property; or
   - Your default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by You, without our prior consent, of any Policy material to this agreement. However, Your concurrent cancellation of all the unexpired Policies shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent You make in connection with this Agreement, the insurance afforded by any of the Policies or Your Payment Obligation.

# WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

A007

# PAYMENT AGREEMENT

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligations* under this *Agreement* or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. You authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and
- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this *Agreement*, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this *Agreement* must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

How arbitrators must be chosen: *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

Qualifications of arbitrators: Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this *Agreement*.

A008

# PAYMENT AGREEMENT

How the arbitration must proceed: The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof. You and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless You and we consent to an extension. The majority decision of any two arbitrators, when filed with You and us will be final and binding on You and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order You to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

*Expenses of Arbitration:* You and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *You* at *Your* address in the *Schedule*. *You* must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither *You* nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *You* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *You* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *You* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

*You* hereby represent and warrant that *Your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *Your* behalf has full right and authority to execute and deliver this agreement and to bind *You* jointly and severally.

Edition 12/98 A

01/00/0000 008/02 9440013

A009

# PAYMENT AGREEME...

## SIGNATURES

TO SIGNIFY AGREEMENT, You and we have caused this Agreement to be executed by the duly authorized representatives of each.

For National Union Fire Insurance Company of Pittsburgh, Pa.,

On behalf of itself and its affiliates first listed above:

In New York, New York,

This _31st_ day of _March_ _2005_

Signed by _[signature]_

Typed Name _George Hall_

Title **Authorized Representative**

For You, our Client

### CIRCLE L ROOFING INC

In _Sarasota County_ _FL_

This _21_ day of _March_ , _2005_

Signed by _[signature]_

Typed Name _Sheila S. Lynn_

Title _President_

A010

2004 Addendum

to

PAYMENT AGREEMENT

By and between us

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Vermont
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company

(Company, "we", "us" or "our")

and *You*, our Client

Circle L Roofing, Inc

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the first day of November 2004 .

1.  The section entitled WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation, is deleted and replaced with the following:

"**Your Payment Obligation**" means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof.  Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

*   the premiums and premium surcharges, taxes and assessments,
*   *Deductible Loss Reimbursements*,
*   any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,
*   any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

- costs and expenses incurred by any third party administrator.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE.* Those reserves shall include specific reserves on known *Losses* and *ALAE,* reserves for incurred but not reported *Losses* and *ALAE,* and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Premium Tax on Deductibles:** If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense, or to pay *Us* the premium taxes and assessments. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments and *You* have not paid *Us* for these taxes and assessments in advance, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies.* If *You* have paid *Us* the taxes and/or assessments and *We* unsuccessfully contest the claim, *You* will not be liable to *Us* for any related fines, penalties or interest. If *We* successfully contest the claim, the taxes and/or assessments *You* paid in advance will be refunded to *You.* Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule.*

2.  The section entitled: **WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?** is amended to include the following:

We will contract with a Third Party Administrator (TPA) that you select for the adjustment of your claims under the Policies provided that we consent to your selection in advance. Our relationship with the TPA will be governed by a claims service agreement between us and the TPA, a copy of which will be made available to you upon your request. Any TPA you select must meet all of our licensing requirements. You will be responsible for any costs associated with any change from one TPA to another TPA that we or you make at any time. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on your behalf shall be considered part of *Your* Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

3. The section entitled: WHEN MUST *YOU* PAY *YOUR* PAYMENT OBLIGATION? is amended to include the following:

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

4. The section entitled: WHAT ABOUT COLLATERAL? is amended to include the following:

Collateral Exchange:

At our sole discretion we may approve Your substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve your substitution or exchange of collateral if you are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

5. The section entitled: HOW WILL DISAGREEMENTS BE RESOLVED?, ARBITRATION PROCEDURES – How arbitrators must be chosen, is deleted and replaced by the following:

How arbitrators must be chosen: You must chose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be executed by their duly authorized representatives in _____, _____ this _____ day of _____.

2004 Addendum to Pmt. Agrmt.Doc

A013

For National Union Fire Insurance Company of Pittsburgh, Pa.,
On behalf of itself and its affiliates first listed above:

In New York, New York,
This 31st day of Mar 2005 2004.
Signed by _____

Typed Name Geoffrey Hall
Title Authorized Representative

For You, our Client

In Sarasota County, FL.
This 21 day of March 2005
Signed by _____
Typed Name Stanley S. Lynn
Title President

2004 Addendum to Pmt. Agrmt. Doc

A014

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 11/01/2004 to 11/01/2005

Annexed to the PAYMENT AGREEMENT

effective on 11/01/2004

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company

The Insurance Company of the State of Pennsylvania

National Union Fire Insurance Company of Pittsburgh, Pa.

Commerce and Industry Insurance Company

Birmingham Fire Insurance Company

Illinois National Insurance Company

American International South Insurance Company

AIU Insurance Company

American International Pacific Insurance Company

Granite State Insurance Company

Landmark Insurance Company

National Union Fire Insurance Company of Louisiana

New Hampshire Insurance Company

and You, our Client

**CIRCLE L ROOFING INC**

**6320 VENTURE DR STE 205**

**BRADENTON  FL  34202-5132**

on behalf of You and all Your subsidiaries or affiliates except those listed below:

For our use only: 837850

A015

## List of Addressees for Notices and Other Purposes

**Your Address:**

Contact Name:
Company Name: CIRCLE L ROOFING INC
Street: 6320 VENTURE DR STE 205
City: BRADENTON    State: FL    Zip: 34202-5132 Phone:

**Your Representative:**

Contact Name: Connie Harding
Company Name: HOBBS GROUP INC
Street: 6771 Professional Parkway West
City: Sarasota    State: FL    Zip: 34240    Phone: (941) 544-3120

**Our Account Executive:**

Contact Name: E. R. Sanders, CPCU
Company Name: American International Group
Street: 1200 Abernathy Road Building 600
City: Atlanta    State: GA    Zip: 30358 2594 Phone: 770 671 2284

**Our Law Representative:**

Contact Name: Peter H. Recksett
Company Name: American International Group
Street: 160 Water Street
City: New York    State: NY    Zip: 10038    Phone: 212 820 4540

**Remit Payments to:**

Contact Name:
Company Name: American International Companies
Street: PO Box 10472
City: Newark    State: NJ    Zip: 07193    Phone:

**Remit Collateral to:**

Contact Name: Attn: Mr. Art Stillwell
Company Name: American International Group Inc.
Street: P.O.Box 923 Wall Street Station
City: New York    State: NY    Zip: 10268    Phone: 212 770 8428

Contact Name:
Company Name:
Street:
City:    State:    Zip:    Phone:

Contact Name:
Company Name:
Street:
City:    State:    Zip:    Phone:

A016

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

WC 7165990.

Commercial General Liability Insurance

GL 8263109.

Automobile Liability Insurance

CA 8261876.

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 11/01/2004 | $384,891 | $0 | $0 | $35,000 | $419,891 |
| 2 | 12/01/2004 | $128,297 | $0 | $0 | $0 | $128,297 |
| 3 | 01/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 5 | 03/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 6 | 04/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 4 | 02/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 7 | 05/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 8 | 06/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 9 | 07/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 10 | 08/01/2005 | $128,296 | $0 | $0 | $0 | $128,296 |
| Subtotals | | $1,539,563 | $0 | $0 | $35,000 | $1,574,563 |
| DLP* | | N/A | N/A | N/A | $1,185,000 | $1,185,000 |
| DEP* | | $0 | $0 | $0 | N/A | $0 |
| Totals | | $1,539,563 | $0 | $0 | $1,220,000 | $2,759,563 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

Notes

(1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

A017

### 3. Additional Payments

On a **Monthly** basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of $0, *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

    ☒*You* at *Your* address shown in the *Schedule*, or

    ☐*Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

### 4. Conversion

The **Conversion Date** for each *Policy* described in section A above shall be the date 18 months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| N/A | |
| | N/A |
| Total Collateral on Hand | |
| | $0 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| CLAIMS PAYMENT FUND | $35,000 | 11/01/2004 |
| LETTER OF CREDIT | $1,250,000 | 11/01/2004 |
| OTHER | $22,500 | 11/01/2004 |
| Total Additional Collateral Required | $1,307,500 | |
| Total Collateral Required | $1,307,500 | |

### 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

A018

a.  Credit Trigger:

    i.  If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

    ii.  If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity:  Type of Debt Rated:

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
| AA- | Aa3     |                            |
| A-  | A3      |                            |
| BBB | Baa2    |                            |
| BB  | Ba2     |                            |

b.  Other Financial Tests or Covenants:

## 3.  Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.,** on behalf of itself and all its affiliates, this _31_ day of _____ _2004_

Signed by _____

Typed Name <u>Geoffrey Hall</u>

Title <u>Authorized Representative</u>

For *You:* **CIRCLE L ROOFING INC**

this _21_ day of _March, 2005_

Signed by _____

Typed Name _Jesse Lynn_

Title _President_

A019

# EXHIBIT B

# PAYMENT AGREEMENT

For

## Insurance and Risk Management Services

effective on the 26 day of January, 2006

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**
**American International Pacific Insurance Company**
**Granite State Insurance Company**
**Landmark Insurance Company**
**National Union Fire Insurance Company of Louisiana**
**New Hampshire Insurance Company**

And *You*, our Client

*CIRCLE L ROOFING INC*
*6320 VENTURE DR STE 205*
*BRADENTON  FL 34202-5132*

In consultation with *Your* representative

*HILB ROGAL HAMILTON INSURANCE*
*7000 CENTRAL PARKWAY # 700*
*ATLANTA  GA  30328*

B001

# PAYMENT AGREEMENT

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have *You* And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should *You* Know About *Your Payment Obligation*? | 4 |
| When Must *You* Pay *Your Payment Obligation*? | 4 |
| What Is the Payment Plan? | 4 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 7 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must *You* and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 9 |
| Are *You* Authorized to Make This Agreement? | 9 |
| Signatures | 10 |
| Schedule of Policies and Payments | Appended |

B002

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:
- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- us, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

**We have agreed** to the following:
- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,
**You have agreed** to the following:
- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any *Policies* and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. **"ALAE"** means Allocated Loss Adjustment Expense as defined in the *Policies*.

2. **"Deductible Loss Reimbursements"** means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.

3. **"Loss" or "Losses"** means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.

4. **"Policy" or "Policies"** means:
   - any of the insurance *Policies* described by their *Policy* numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement.

5. **"Retained Amount" or "Retention"** means one of the following:
   - **Self-Insured Retention**: the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - **Deductible**: the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - **Loss Limit**: the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

B003

# PAYMENT AGREEMENT

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You"** or **"Your"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance *Policies* and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   - the premiums and premium surcharges,
   - *Deductible Loss Reimbursements*,
   - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,
   - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

   **Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION*?

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance *Policies* and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to *You* whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance *Policies* to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the *Policy* year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to *You* under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement. A Credit Fee may be charged for any unsecured credit extended to *You*. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the *Policy* year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION*?

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## WHAT IS THE PAYMENT PLAN?

B004

# PAYMENT AGREEMENT

## Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

## Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

# WHAT IS THE BILLING METHOD?

**Deposit and Installments:** *You* must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the Direct Billing Method or the Automatic Withdrawal Method, or a combination of both. *Your* choice is shown in the *Schedule*.

## Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

## Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*. *You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your Retention* and *Your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

B005

## PAYMENT AGREEMENT

### WHAT ABOUT COLLATERAL?

#### Collateral is Required

You must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance *Policies* or agreements to *Your Payment Obligation*.

#### Grant of Security Interest and Right to Offset

You grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation. You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

#### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule.*

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies.* If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

#### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

#### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule,*

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,

4. any material adverse change in the financial condition of *You, Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

B006

## PAYMENT AGREEMENT

### Collateral Adjustment Procedure

The additional collateral that *You* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to *Your* primary casualty insurance with us.

### Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request.

If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement,
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

### Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is a Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

## WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *Your* insolvency, or the occurrence of any of the following:

    - the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

    - *Your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *You*, without our prior consent, of any *Policy* material to this agreement. However, *Your* concurrent cancellation of all the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

## WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

B007

# PAYMENT AGREEMENT

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligations* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default. .

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. You authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and

- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

B008

## PAYMENT AGREEMENT

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

You and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless You and we consent to an extension. The majority decision of any two arbitrators, when filed with You and us will be final and binding on You and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order You to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

*Expenses of Arbitration:* You and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to You at Your address in the *Schedule*. You must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither You nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If You or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either You or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by You and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

You hereby represent and warrant that Your execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on Your behalf has full right and authority to execute and deliver this agreement and to bind You jointly and severally.

# PAYMENT AGREEMENT

## SIGNATURES

TO SIGNIFY AGREEMENT, *You* and we have caused this Agreement to be executed by the duly authorized representatives of each.

For National Union Fire Insurance Company of Pittsburgh, Pa.,

On behalf of itself and its affiliates first listed above:

In New York, New York,

This 25th day of April 2006

Signed by _____

Typed Name Geoffrey Hall

Title Authorized Representative

For *You*, our Client

**CIRCLE L ROOFING INC**

In BRADENTM , FL

This 3rd day of APRIL 2006

Signed by _____

Typed Name BETSEY LYNN

Title CEO

B010

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 01/26/2006 to 11/01/2006

Annexed to the PAYMENT AGREEMENT

effective on 01/26/2006

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company
and *You*, our Client

**CIRCLE L ROOFING INC**
**6320 VENTURE DR STE 205**
**BRADENTON   FL   34202-5132**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 653150

Edition 1/99                          Paid Loss Payments Method                          Page 1 of 5

B011

## List of Addressees for Notices and Other Purposes

### Your Address:

Contact Name:
Company Name: CIRCLE L ROOFING INC
Street: 6320 VENTURE DR STE 205
City: BRADENTON          State: FL          Zip: 34202-5132 Phone:

### Your Representative:

Contact Name: John L Lubatti, CPCU, ARM, ARe
Company Name: HILB ROGAL HAMILTON INSURANCE
Street: 7000 CENTRAL PARKWAY # 700
City: ATLANTA          State: GA          Zip: 30328          Phone: (404) 942-5122

### Our Account Executive:

Contact Name: E. R. Sanders, CPCU
Company Name: American International Group
Street: 1200 Albernathy Road Building 6000
City: Atlanta          State: GA          Zip: 30328          Phone: 770 671 2284

### Our Law Representative:

Contact Name: Peter H. Recksett
Company Name: American International Group
Street: 160 Water Street
City: New York          State: NY          Zip: 10037          Phone: 212 820 4540

### Remit Payments to:

Contact Name:
Company Name: American International Companies
Street: PO Box 10472
City: Newark          State: NJ          Zip: 07193          Phone:

### Remit Collateral to:

Contact Name: Attn: Mr. Art Stillwell
Company Name: American International Group Inc.
Street: P.O.Box 923 Wall Street Station
City: New York          State: NY          Zip: 10268          Phone:

Contact Name:
Company Name:
Street:
City:          State:          Zip:          Phone:

Contact Name:
Company Name:
Street:
City:          State:          Zip:          Phone:

B012

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

WC 1361319.

Commercial General Liability Insurance

GL 1757943.

Automobile Liability Insurance

CA 8262290.

Other Insurance

Other Agreements (Describe)

The billing for the loss conversion factor (141,257) will occur monthly based upon the paid losses.

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 01/26/2006 | $2,022,781 | $0 | $0 | $47,694 | $2,070,475 |
| | Subtotals | $2,022,781 | $0 | $0 | $47,694 | $2,070,475 |
| | DLP* | N/A | N/A | N/A | $1,365,706 | $1,365,706 |
| | DEP* | $141,257 | $0 | $0 | N/A | $141,257 |
| | Totals | $2,164,038 | $0 | $0 | $1,413,400 | $3,677,438 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| 07/31/2007 | Non LRRP-WCThe Entire Contract | $141,257 |

Notes     (1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a **Monthly** basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such

B013

Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of _$0_. *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

    ☒ Billing to

        ☒ *You* at *Your* address shown in the *Schedule*, or

        ☐ *Your* Representative at its address shown in the *Schedule*; or

    ☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

The **Conversion Date** for each *Policy* described in section A above shall be the date _16_ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

# C. Security Plan

## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Escrow | $35,000 |
| LOCs | $1,250,000 |
| **Total Collateral on Hand** | **$1,285,000** |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| LETTER OF CREDIT | $1,000,000 | 2006-01-26 |
| CLAIMS PAYMENT FUND | $47,694 | 2006-01-26 |
| **Total Additional Collateral Required** | **$1,047,694** | |
| **Total Collateral Required** | **$2,332,694** | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

    i.    If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

    ii.   If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

B014

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity:  Type of Debt Rated:

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
| AA- | Aa3     |                            |
| A-  | A3      |                            |
| BBB | Baa2    |                            |
| BB  | Ba2     |                            |

b.  Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, National Union Fire Insurance Company of Pittsburgh Pa., on behalf of itself and all its affiliates,
this 25 day of April 2006
Signed by _____
Typed Name George Mair
Title Authorized Representative

For You: CIRCLE L ROOFING INC
this 12th day of April, 2006
Signed by _____
Typed Name George Lynn
Title CEO

# 2004 Addendum

## to

## PAYMENT AGREEMENT

**By and between us**

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company

The Insurance Company of the State of Pennsylvania

National Union Fire Insurance Company of Vermont

National Union Fire Insurance Company of Pittsburgh, Pa.

Commerce and Industry Insurance Company

Birmingham Fire Insurance Company

Illinois National Insurance Company

American International South Insurance Company

AIU Insurance Company

American International Pacific Insurance Company

Granite State Insurance Company

Landmark Insurance Company

National Union Fire Insurance Company of Louisiana

New Hampshire Insurance Company

(Company, "we", "us" or "our")

and *You*, our Client

*CIRCLE L ROOFING INC*
*6320 VENTURE DR STE 205*
*BRADENTON  FL  34202-5132*

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the 26th day of January, 2006

1.  The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation** is deleted and replaced with the following:

    **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incepted before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    .  the premiums and premium surcharges, taxes and assessments,

    .  *Deductible Loss Reimbursements,*

    .  any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,

    .  any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

    .  costs and expenses incurred by any third party administrator.

    **Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and

B016

*ALAE.* These reserves shall include specific reserves on known *Losses* and *ALAE,* reserves for incurred but not reported *Losses* and *ALAE,* and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Premium Tax on Deductibles:** If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense, or to pay *Us* the premium taxes and assessments. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments and *You* have not paid *Us* for these taxes and assessments in advance, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies.* If *You* have paid *Us* the taxes and/or assessments and *We* unsuccessfully contest the claim, *You* will not be liable to *Us* for any related fines, penalties or interest. If *We* successfully contest the claim, the taxes and/or assessments *You* paid in advance will be refunded to *You.* Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule.*

2.  The section entitled: **WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?** is amended to include the following:

    We will contract with a Third Party Administrator (TPA) that you select for the adjustment of your claims under the Policies provided that we consent to your selection in advance. Our relationship with the TPA will be governed by a claims service agreement between us and the TPA, a copy of which will be made available to you upon your request. Any TPA you select must meet all of our licensing requirements. You will be responsible for any costs associated with any change from one TPA to another TPA that we or you make at any time. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on your behalf shall be considered part of *Your* Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; file transfer costs; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

3.  The section entitled: **WHEN MUST YOU PAY YOUR PAYMENT OBLIGATION?** is amended to include the following:

    All payments are due by the due date stated in the *Schedule,* or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

4.  The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the following:

    Collateral Exchange:

    At our sole discretion we may approve *Your* substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve your substitution or exchange of collateral if you are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

5.  The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED?, ARBITRATION PROCEDURES - How arbitrators must be chosen,** is deleted and replaced by the following:

    **How arbitrators must be chosen:** You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

B017

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives in _____ this _____ day of _____
_____

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**

On behalf of itself and its affiliates first listed above:

In New York, New York,

This _____25th_____ day of

_____April_____, 2006

Signed by _____

Typed Name **Geoffrey Hall**

Title **Authorized Representative**

For **You, our Client**

**CIRCLE L ROOFING INC**

In _____Bradenton_____ _____FL.____

This _12th_ day of _April_ 2006

Signed by _____

Typed Name ___GEORGE ST. LYNN___

Title _____CEO_____

B018

# EXHIBIT C

# Schedule of Policies and Payments

## Incurred Loss Payments Plan

Effective from 11/01/2006 to 11/01/2007

Annexed to the PAYMENT AGREEMENT

effective on 11/01/2006

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**
**American International Pacific Insurance Company**
**Granite State Insurance Company**
**Landmark Insurance Company**
**National Union Fire Insurance Company of Louisiana**
**New Hampshire Insurance Company**
and *You*, our Client

***CIRCLE L ROOFING INC***
***9009 TOWN CENTER PARKWAY***
***BRADENTON  FL  34202-5132***

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 653151

C001

## List of Addressees for Notices and Other Purposes

### Your Address:

**Contact Name:**
**Company Name:** CIRCLE L ROOFING INC
**Street:** 9009 TOWN CENTER PARKWAY
**City:** BRADENTON    **State:** FL    **Zip:** 34202-5132 **Phone:** (941) 907-7240

### Your Representative:

**Contact Name:** Connie Harding
**Company Name:** HILB ROGAL HAMILTON INSURANCE
**Street:** 7000 CENTRAL PARKWAY # 700
**City:** ATLANTA    **State:** GA    **Zip:** 30328    **Phone:** (404) 942-5122

### Our Account Executive:

**Contact Name:** E. R. Sanders, CPCU
**Company Name:** American International Group
**Street:** 1200 Albernathy Road Building 600
**City:** Atlanta    **State:** GA    **Zip:** 30328    **Phone:** 770 671 2284

### Our Law Representative:

**Contact Name:** Peter H. Recksett
**Company Name:** American International Group
**Street:** 160 Water Street
**City:** New York    **State:** NY    **Zip:** 10037    **Phone:** 212 820 4540

### Remit Payments to:

**Contact Name:**
**Company Name:** American International Companies
**Street:** PO Box 10472
**City:** Newark    **State:** NJ    **Zip:** 07193    **Phone:**

### Remit Collateral to:

**Contact Name:** Attn: Mr. Donato DiLuzio
**Company Name:** American International Group Inc.
**Street:** P.O.Box 923 Wall Street Station
**City:** New York    **State:** NY    **Zip:** 10268    **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**    **State:**    **Zip:**    **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**    **State:**    **Zip:**    **Phone:**

C002

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

**WC 7179893.**

Commercial General Liability Insurance

**GL 1792226.**

Automobile Liability Insurance

**CA 8262535.**

Other Insurance (describe):

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 11/01/2006 | $2,342,318 | $0 | $7,500 | $0 | $2,349,818 |
| | Subtotals | $2,342,318 | $0 | $7,500 | $0 | $2,349,818 |
| | DLP* | N/A | N/A | N/A | $2,225,856 | $2,225,856 |
| | DEP* | $0 | $0 | $0 | N/A | $0 |
| | Totals | $2,342,318 | $0 | $7,500 | $2,225,856 | $4,575,674 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Additional Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

**Notes**

(1) "Provision for Expenses and Excess Losses" is a part of the Premium. The remainder of the Premium is included under "Provision for Limited Losses".

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

*You* must pay us the installment amounts by the due dates as specified in Section B.1. We have calculated the part of those installments designated as "Provision for Limited Losses" to equal the *Losses* within *Your Retention* and *Your* share of *ALAE* that we expect to incur during the period for which Provision for Limited Losses amounts are shown in Section B.1. For the purposes of this *Schedule*, the amount we incur will be the sum of the amounts we pay and the amounts we reserve for payment on claims that have been reported to us, but shall not include our reserves for *Losses* that have been incurred but have not been reported to us.

By the end of that period,

- we will determine the actual amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we have incurred under the *Policies*, and

- If we have incurred more for *Loss* within *Your Retention* and *Your* share of *ALAE* under the *Policies* than the sum that *You* have paid us as Provision for Limited Losses, *You* must upon our demand pay us the difference, or

- if we have incurred less for *Loss* within *Your Retention* and *Your* share of *ALAE* under the *Policies* than the sum that *You* have paid us as Provision for Limited Losses, we will credit the difference against *Your* subsequent obligation to pay us as described below; and

- we will calculate the amount of *Losses* within *Your Retention* and *Your* share of *ALAE* that we expect to incur during the next annual period. We will notify *You* of the due date and amount of each subsequent payment due us during the next annual period.

We will repeat this procedure at the end of each subsequent annual period until Conversion.

**Billing Method:**

    ☒ Billing to

        ☒ *You* at *Your* address shown in the *Schedule*, or

        ☐ *Your* Representative at its address shown in the *Schedule*; or

    ☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

### 4. Conversion

The Conversion Date for each *Policy* described in section A above shall be the date <u>18</u> months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Escrow | $82,694 |
| LOCs | $2,250,000 |
| **Total Collateral on Hand** | $2,332,694 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Cash Security (Cash Collateral) | $556,464 | 2006-11-01 |
| Cash Security (Cash Collateral) | $278,232 | 2006-12-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-01-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-02-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-03-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-04-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-05-01 |
| **Total Additional Collateral Required** | **$2,225,856** | |

10/31/2000 004/02 0464016

C004

| Total Collateral Required | $4,558,550 |
|---|---|

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

    i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

    ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

*Name of Entity:  Type of Debt Rated:*

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|---|---|---|
| | | |
| | | |
| | | |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|---|---|---|
| | | |
| | | |

b. Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburg Pa.,** on behalf of itself and all its affiliates,

this _13th_ day of _Dec_ , _2006_

Signed by : _____

Typed Name **Geoffrey Hall**

Title **Authorized Representative**

For You: **CIRCLE L ROOFING INC**

this _1st_ day of _December_ , _2006_

Signed by _____

Typed Name _JOSEPH J. LYNN_

Title _PRESIDENT_

C005

**2006 Addendum**

**to**

**PAYMENT AGREEMENT**

By and between us

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company

The Insurance Company of the State of Pennsylvania

National Union Fire Insurance Company of Vermont

National Union Fire Insurance Company of Pittsburgh, Pa.

Commerce and Industry Insurance Company

Birmingham Fire Insurance Company

Illinois National Insurance Company

American International South Insurance Company

AIU Insurance Company

Granite State Insurance Company

New Hampshire Insurance Company

(Company, "we", "us" or "our")

and *You*, our Client

*CIRCLE L ROOFING INC*
*9009 TOWN CENTER PARKWAY*
*BRADENTON  FL  34202-5132*

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the <u>first</u> day of <u>November, 2006</u>

1. The section entitled **WHO HAS AGREED TO THIS AGREEMENT?**, is deleted and replaced with the following:

    This Agreement is between:

    - *You*, the organization(s) named as "our Client" in the *Schedule*, and

    - *us*, the insurers set forth above as "Company" "we," "us" and "our" in this Addendum.

2. The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation**, is deleted and replaced with the following:

    **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    - the premiums and premium surcharges, taxes and assessments,

    - *Deductible Loss Reimbursements*,

    - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,

    - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

    - costs and expenses incurred by any third party administrator.

C006

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Premium Tax on Deductibles:** If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies*. Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule*.

3. The section entitled: **WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?** is amended to include the following:

   We will contract with a Third Party Administrator (TPA) that you select for the adjustment of your claims under the Policies provided that we consent to your selection in advance. Our relationship with the TPA will be governed by a claims service agreement between us and the TPA, a copy of which will be made available to you upon your request. Any TPA you select must meet all of our licensing requirements. You will be responsible for any costs associated with any change from one TPA to another TPA that we or you make at any time. We will exercise good faith consistent with usual and customary commercial practice when we change one TPA to another TPA. Any amounts we pay to any TPA on your behalf shall be considered part of Your Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4. The section entitled: **WHEN MUST YOU PAY YOUR PAYMENT OBLIGATION?** is amended to include the following:

   All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5. The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the following:

   Collateral Exchange:

   At our sole discretion we may approve Your substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve your substitution or exchange of collateral if you are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

6. The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRATION PROCEDURES - How Arbitrators Must Be Chosen**, is deleted and replaced with the following:

   **How arbitrators must be chosen:** You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of court of competent jurisdiction in the City, County, and State of New York.

7. The section entitled: **ARE YOU AUTHORIZED TO MAKE THIS AGREEMENT?** is amended to include the following:

---

C007

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *Us*, constitute the basis for a program of insurance coverage. We would not have entered into any of them without your agreement on all of them. For that reason, you should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For **National Union Fire Insurance Company of Pittsburgh, Pa.**,

On behalf of itself and its affiliates first listed above:

In New York, New York,

This _10th_ day of _Dec_, **2006**

Signed by _[signature]_

Typed Name ~~Geoffrey Hall~~

Title **Authorized Representative**

For *You*, our Client

**CIRCLE L ROOFING INC**

In _BRADENTON_, _FL_

This _1st_ day of _December_, _06_

Signed by _[signature]_

Typed Name _Jesse O'Cynn_

Title _VP PRESIDENT_

2006 Addendum to Pmt. Agrmt.          10O1/2006 00402 9464916          Page 3 of 3

C008

# EXHIBIT D

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CIRCLE L. ROOFING, INC.,

     Plaintiff,

vs.                             CASE NO.: _____

AMERICAN INTERNATIONAL GROUP,
INC. and AMERICAN HOME
ASSURANCE COMPANY,

     Defendants.

_____/

## COMPLAINT

Plaintiff, CIRCLE L. ROOFING, INC., ("Plaintiff") a Florida Corporation, by and through its undersigned counsel, files this Complaint against Defendants, AMERICAN INTERNATIONAL GROUP, INC. ("AIG") and AMERICAN HOME ASSURANCE COMPANY ("AHA" and collectively "Defendants") and states the following:

1.    This civil action is filed in response to the egregious conduct of the Defendants in knowingly withholding unearned premiums due to the Plaintiff under a workers' compensation insurance policy, and failing to return significant cash security which is the property of the Plaintiff.

2.    Pursuant to this Complaint, Plaintiff brings counts against Defendants sounding in breach of contract, declaratory relief, breach of implied covenant of good faith and fair dealing, and conversion.

{00084034.DOC;1}

3.    All conditions precedent to the maintenance of this action have been met, satisfied or waived.

## PARTIES, JURISDICTION & VENUE

4.    Plaintiff is a Florida Corporation with its principle place address in Bradenton, Florida.

5.    Defendant, AIG, is a Delaware corporation with its principal address in New York, New York.

6.    Defendant, AHA, a New York corporation, is a member company of AIG.

7.    Defendants regularly conduct business in the State of Florida, maintain offices and agents in the State of Florida, and entered into multiple contracts for the provision of various forms of insurance with Plaintiff, a Florida resident.

8.    This Court has subject matter jurisdiction as this dispute is between citizens of different states of the United States, and the amount in controversy exceeds $75,000, exclusive of interest, fees and costs.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claims occurred in or around Polk County, Florida, in the Middle District of Florida.

## FACTS COMMON TO ALL CLAIMS

10.    Plaintiff is a roofing company employing a significant number of workers, and is required to maintain a workers' compensation policy under Florida law.

11.    At various times prior to this action, Defendants, through local brokering agent HILB Rogal & Hobbs of Florida, Inc. ("HRH"), issued to Plaintiff insurance contracts, including contracts providing for the following coverage: (i) workers

compensation; (ii) general liability; (iii) automobile; (iv) umbrella; (v) crime; and (vi) inland marine.

12.    More specifically, Defendant AIG, by and through its member entity AHA issued to Plaintiff a workers compensation and employers liability insurance policy, which provided workers' compensation insurance to Plaintiff's employees from November 1, 2006 though November 1, 2007 (the "Policy"). A true and correct copy of the Policy is attached hereto as **Exhibit "A"**.

13.    Pursuant to the Policy, Plaintiff was required to, and did, pay premiums to Defendants in full at the inception of the Policy based upon a projected employee payroll amount and employee job classifications.

14.    In addition, Defendants required that Plaintiff provide security to the Defendants for covered losses. In previous policies issued by Defendants, Defendants required that Plaintiff provide a third party line of credit sufficient to cover loss reserves for claims. Under the new Policy, Defendants refused to accept the line of credit as security, but instead required Plaintiff to provide cash as security.

15.    Plaintiff fully performed under the Policy, timely paying premiums and posting cash security in excess of three million six hundred thousand dollars ($3,600,000.00) (the "Security").

16.    During the term of the Policy, Plaintiff raised a number of concerns regarding Defendants' miscalculation of Policy funding requirements, the disparity between cash reserves and known claims, and other Policy issues.

17.    After trying unsuccessfully to resolve these issues with Defendants from January of 2007 until June of 2007, Plaintiff had no choice but to terminate the Policy according to its terms on or about July 1, 2007.

18.    Subsequent to the cancellation of the Policy, Defendants performed an audit to determine the amount of any unearned premiums under the Policy. The audit has been completed for some time, and it shows that Plaintiff is due a substantial refund for unearned premiums (the "Unearned Premiums").

19.    Upon termination of the Policy, Defendants were required to return the Unearned Premiums and the Security to Plaintiff.

20.    Plaintiff has made several demands for the return of the Unearned Premiums and the Security pursuant to the Policy and state law, but Defendants have refused to return the amounts owed.

21.    In addition, Defendants have been wholly unresponsive to requests for information and other legitimate Policy-related requests.

22.    Plaintiff has complied with all the terms and conditions under the Policy.

## COUNT I – BREACH OF CONTRACT

23.    Plaintiffs repeat and re-allege Paragraphs 1 to 22 as if fully set forth herein.

24.    Plaintiff and Defendants entered into a valid and enforceable contract — *to wit* — the Policy.

25.    Defendants breached the Policy when they, among other things, failed to return the Unearned Premiums and the Security.

26.    Plaintiff was damaged as a result of Defendants' breaches of the Policy.

27.   Plaintiff is entitled to reasonable attorneys' fees and costs in bringing this action.

WHEREFORE, Plaintiffs seek judgment against Defendants for breaching the Policy, for the award of damages, for the award of attorneys' fees and costs, and for such other and further relief as the Court deems appropriate.

### COUNT II – DECLARATORY RELIEF

28.   Plaintiffs repeat and re-allege Paragraphs 1 to 22 as if fully set forth herein.

29.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, Plaintiff seeks a judgment from the Court declaring Plaintiff's rights in the Unearned Premiums and the Security superior to that of Defendants.

30.   Plaintiff requests that this Court grant further relief as appropriate pursuant to 28 U.S.C. §2202.

WHEREFORE, pursuant to 28 U.S.C. §§2201, 2202, Plaintiff demand declaratory judgment against Defendants declaring Plaintiff's rights in the Unearned Premiums and the Security superior to that of Defendants, and for such other relief as is just.

### COUNT III – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

31.   Plaintiff repeats and re-alleges Paragraphs 1 to 22 as if fully set forth herein.

32.   Plaintiff and Defendants were parties to a valid and enforceable written contract – *to wit* – the Policy.

33.   The contract is ambiguous about the permissibility or scope of the conduct in question.

A.    Defendants, through conscious and deliberate acts, refused and continue to refuse to discharge contractual responsibilities that unfairly frustrate the Policy's purpose and disappoints the Plaintiff's expectations in the Policy.

B.    Defendants' breach deprives the Plaintiff of the Policy's benefits.

C.    Plaintiff has suffered damages as a result of Defendants' breach.

W e b o b c l   o b   Plaintiff seek judgment against Defendants for breaching the implied covenant of good faith and fair dealing, for the award of damages, and for such other and further relief as the Court deems appropriate.

## COUNT IV – CONVERSION

D.    Plaintiff repeats and re-alleges Paragraphs 1 to 22 as if fully set forth herein.

E.    Defendants have, without authorization or excuse, deprived Plaintiff of its rights in the Unearned Premiums and the Security.

F.    This deprivation is inconsistent with the Defendants' ownership interest in the Unearned Premiums and the Security.

40.    Plaintiff has made repeated demand upon Defendants for the return of the Unearned Premiums and the Security, without success.

41.    The Unearned Premiums and Security are specifically identifiable.

42.    Plaintiff did not consent to the Defendants' continued, unauthorized possession of the Unearned Premiums and Security.

W e b o b c l   o b   Plaintiff demands judgment against Defendants for conversion, for the award of damages, and for such other and further relief as is just.

## JURY DEMAND

Plaintiff demands a trial by jury on all matters to which it is entitled by law.

Dated this the 31st day of December, 2007.

Respectfully submitted,

/s/ Andrew W. Lennox
Michael P. Brundage
Florida Bar No. 611621
Andrew W. Lennox
Florida Bar No. 937681
Jennis Bowen & Brundage, P.L.
400 North Ashley Drive, Suite 2540
Tampa, FL 33602
813-229-1700
813-229-1707 (fax)
mbrundage@jennisbowen.com
COUNSEL FOR PLAINTIFF

{00084034.DOC;}

7

# EXHIBIT E

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CIRCLE L. ROOFING, INC.,

        Plaintiff,

vs.                             CASE NO.: 8:07-cv-2378-T-26TBM

AMERICAN INTERNATIONAL GROUP,
INC. and AMERICAN HOME
ASSURANCE COMPANY,

        Defendants.

_____/

**PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY MANDATORY
INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

**(Expedited Hearing Requested)**

    Plaintiff, CIRCLE L. ROOFING, INC., ("Plaintiff") a Florida Corporation, by

and through its undersigned counsel, files this Motion for Preliminary Mandatory

Injunctive Relief against Defendants, AMERICAN INTERNATIONAL GROUP, INC.

("AIG") and AMERICAN HOME ASSURANCE COMPANY ("AHA" and collectively

"Defendants") and state the following:

    1.    This civil action was filed in response to the egregious conduct of the

Defendants in knowingly withholding unearned premiums due to the Plaintiff under a

workers' compensation insurance policy, and failing to return significant cash security

which is unquestionably property of the Plaintiff.

    2.    Pursuant to the Complaint filed in this Court, Plaintiff brings counts against

Defendants sounding in breach of contract, declaratory relief, breach of implied covenant

of good faith and fair dealing, and conversion.

3.     The Defendants have been properly served with a copy of the Complaint and this Motion.

## Background

4.     Plaintiff is a roofing company employing a significant number of workers, and is required to maintain a workers' compensation policy under Florida law.

5.     At various times prior to this action, Defendants, through local brokering agent HILB Rogal & Hobbs of Florida, Inc. ("HRH"), issued to Plaintiff insurance contracts, including contracts providing for the following coverage: (i) workers' compensation; (ii) general liability; (iii) automobile; (iv) umbrella; (v) crime; and (vi) inland marine.

6.     More specifically, Defendant AIG, by and through its member entity AHA, issued to Plaintiff a workers' compensation and employers liability insurance policy, which provided workers' compensation insurance to Plaintiff's employees from November 1, 2006 through November 1, 2007 (the "Policy").

7.     Pursuant to the Policy, Plaintiff was required to, and did pay premiums to Defendants in full at the inception of the Policy based upon a projected employee payroll amount and employee job classifications.

8.     In addition, Defendants required that Plaintiff provide security to the Defendants for covered losses.  In previous policies issued by Defendants, Defendants required that Plaintiff provide a third party line of credit sufficient to cover loss reserves for claims.

9.     Under the new Policy, Defendants refused to accept the line of credit as security, but instead required Plaintiff to provide a significant amount of its own cash as

security. Specifically, pursuant to a payment schedule agreed to by the parties and set forth in an agreement titled "Incurred Loss Payments Plan," Plaintiff was required to build up a specific fund of Plaintiff's money in order to limit the risk to Defendants under the Policy.

10. Plaintiff fully performed under the Policy and the Incurred Loss Payments Plan, timely paying premiums and posting its own cash as security which currently exists in an amount in excess of three million six hundred thousand dollars ($3,600,000.00) (the "Security").

11. During the term of the Policy, Plaintiff raised a number of concerns regarding Defendants' miscalculation of Policy funding requirements, the disparity between cash reserves and known claims, and other Policy issues.

12. After trying unsuccessfully to resolve these issues with Defendants from January of 2007 until June of 2007, Plaintiff had no choice but to terminate the Policy according to its terms on or about July 1, 2007.

13. Due to circumstances beyond the control of Plaintiff, Plaintiff's business has suffered a significant downturn, the result of which is that Plaintiff is barely able to maintain its ongoing business operations. In short, Plaintiff is cash starved and laboring under burdensome obligations it increasingly cannot satisfy.

14. Subsequent to the cancellation of the Policy, Defendants performed an audit to determine the amount of any unearned premiums under the Policy. The audit has been completed for some time, and it shows that Plaintiff is due a substantial refund for unearned premiums (the "Unearned Premiums").[1]

---

[1]     Pursuant to this Motion, Plaintiff seeks a mandatory injunction for the return of the Security only.

15.  Upon termination of the Policy, Defendants were required to return the Unearned Premiums and the Security to Plaintiff, or to Plaintiff's designee. The return of these monies is the only hope Plaintiff has in avoiding the termination of its business operations.

16.  Plaintiff has made several demands for the return of the Unearned Premiums and the Security pursuant to the Policy and state law, but Defendants have refused to return the amounts owed.

17.  Since the filing of the Complaint, a representative of the Defendants has suggested to Plaintiff that the return of monies due Plaintiff was most likely delayed as a result of Defendants' self-serving internal financial reporting concerns for the year ending 2007, in complete disregard of Plaintiff's right to the monies, and with full knowledge of the Plaintiff's deteriorating financial condition.

18.  In filing this Motion, Plaintiff seeks the return of the Security, which is Plaintiff's own, specifically-identified property, and which the Defendants refuse to turn over.

19.  Plaintiff's Chief Financial Officer, Steward Wagner, has filed an affidavit in support of the relief sought in this Motion (the "Wagner Affidavit"). Attached to the Wagner Affidavit is a copy of the Incurred Loss Payment Plan.

## MEMORANDUM OF LAW

In some cases, prohibitory injunctive relief is inappropriate or inadequate and compulsion of positive action is required. *Ex parte* Lennon, 166 U.S. 548 (1897). In such circumstances, federal courts have jurisdiction and power, pursuant to Rule 65 of

the Federal Rules of Civil Procedure, to grant mandatory injunctions, even at a preliminary stage, in order to compel restoration of the status quo pending final adjudication. Agwilines, Inc., v. National Labor Relations Board, 87 F.2d 146 (5th Cir. 1936). Mandatory preliminary injunctions are not designed to *preserve* the status quo, but are granted in those circumstances when the exigencies of the situation demand relief in the form of positive action. Wetzel v. Edwards, 635 F.2d 283 (4th Cir. 1980). Thus, where the status quo is a condition not of rest, but of action, and a condition of rest will cause irreparable harm, a mandatory injunction is proper. Ferry-Morse Seed Co. v. Food Corn, Inc., 729 F.2d 589 (8th Cir. 1984). The principles upon which mandatory and prohibitory injunctions are granted do not materially differ. Id.

"When a party requests injunctive relief, the moving party has the burden of proving four elements, that: (1) the movant will succeed on the merits of the case; (2) a substantial threat exists that the movant will suffer irreparable injury if the injunction is not granted; (3) the threatened injury to the movant outweighs the threatened harm the injunction may cause the opposing party; and (4) granting the injunction will not disserve the public interest." Ray v. Lowder, 2003 WL 22384806 at *2 (citing Warren Publ'g., Inc. v. Microdos Data Corp., 115 F.3d 1509, 1516 (11th Cir.1997)).

Based on the actions of the Defendants to date, Plaintiff has a substantial likelihood of success on the merits of its claims as set forth in the Complaint, specifically as it relates to the return of the Security. The Security represents a specific, identifiable fund, which is the property of Plaintiff alone, and which fund the Defendants refuse, without reason or cause, to turn over. *See* Metropolitan Investment Corp. v. Buchler, 575 So.2d 262 (Fla. 3d DCA 1991)(recognizing under Florida law that injunctive relief is

proper when specific, identifiable funds are improperly withheld); *see also* <u>Georgia</u> <u>Banking Co. v. GMC Lending & Mortgage Services Corp.</u>, 923 So.2d 1224 (Fla. 3d DCA 2006)(injunctive relief appropriate to prevent dissipation of specific, identifiable funds which party refuses to turn over).

If the Security is not returned, Plaintiff's interests will continue to be irreparably harmed as it will slide deeper and deeper into financial despair. The threatened injury to Plaintiff if this Court does not grant preliminary injunctive relief far outweighs the threatened harm an injunction might cause the Defendants, who simply have no remaining interest in the Security.

The granting of mandatory preliminary injunctive relief in this case will serve the public policies of maintaining the Plaintiff's business operations so that it may satisfy its debts and serve its customers, and to restrain and discourage the unauthorized retention of assets by an insurer to the detriment of the insured.

Although Rule 65 (c) of the Federal Rules of Civil Procedure requires Plaintiff to give security for the issuance of the injunctive relief sought in this Motion, Plaintiff suggests that the amount set by the Court be *de minimis*, as Defendants have no remaining interest in the Security. Notwithstanding the relief sought in this Motion, Plaintiff expressly reserves all rights to recover damages against the Defendants for any and all harm caused by the improper withholding of the Security as stated in the Complaint.

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order granting preliminary injunctive relief against the Defendants substantially in the form of the proposed order attached hereto, issuing a mandatory injunction that the Security be

refunded, and for such other relief as this Court deems just.

Dated this the 22nd day of January, 2008.

Respectfully submitted,

/s/ Andrew W. Lennox
Michael P. Brundage
Florida Bar No. 611621
Andrew W. Lennox
Florida Bar No. 937681
Jennis Bowen & Brundage, P.L.
400 North Ashley Drive, Suite 2540
Tampa, FL  33602
813-229-1700
813-229-1707 (fax)
alennox@jennisbowen.com
COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing motion and proposed order have been filed by CM/ECF and served by Certified U.S. Mail, Return Receipt Requested to: **American International Group, Inc.,** c/o United States Corporation Company, 2711 Centerville Road, Suite 400, Wilmington, DE  19808, **American Home Assurance Company,** c/o John Quinlan Doyle, President, 70 Pine Street, New York, NY  10038, **American International Companies,** c/o Melanie L. Katsur, 175 Water Street, 18th Floor, New York, NY  10038, and **Michael S. Davis,** Counsel for AIG and AHA, Zeichner Ellman & Krause, LLP, 575 Lexington Avenue, New York, NY  10022 on this 22nd day of January, 2008.

/s/ Andrew W. Lennox
Andrew W. Lennox

# EXHIBIT F

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CIRCLE L ROOFING, INC.,                                    Case No.: 8:07-cv-2378-T-26TBM

        Plaintiff,

vs.

AMERICAN INTERNATIONAL GROUP,
INC. and AMERICAN HOME
ASSURANCE COMPANY,

        Defendants.
_____/

## DEFENDANTS' MOTION TO STAY JUDICIAL PROCEEDINGS PURSUANT TO SECTION 3 OF THE FEDERAL ARBITRATION ACT, AND INCORPORATED MEMORANDUM OF LAW

American Home Assurance Company ("AHAC") and American International Group, Inc. ("AIG"),[1] by their undersigned counsel, hereby show the following and request that this Court stay all proceedings in the above-captioned matter.

## MEMORANDUM OF LAW

**I.    PROCEDURAL HISTORY**

The Complaint in this action was filed on December 31, 2007, seeking damages based upon the allegation that AHAC did not return to Plaintiff amounts delivered to AHAC as security for Plaintiff's obligations to AHAC. Based upon the affidavits of service filed with the Court, the Complaint was served upon Defendant AHAC on January

---

[1] American International Group, Inc. is a holding company and not a proper party to this action. AHAC is the proper party.

10, 2008, and on Defendant AIG on January 16, 2008. Accordingly, no response is due in this Court before January 30, 2008.

Plaintiff filed an alleged emergency motion for preliminary injunction on January 18, 2008. On January 22, 2008, this Court issued an order denying the motion for preliminary injunction without prejudice because no affidavit of service upon Defendant AIG was on file. That same day, Defendants' counsel initiated a discussion pursuant to Local Rule 3.01(g), advised counsel for Plaintiff that this dispute is subject to arbitration, and provided counsel for Plaintiff with another copy of the controlling arbitration clauses. Plaintiff nonetheless re-filed its same motion for preliminary injunction without reference to the controlling arbitration clauses.

## II.    ANALYSIS

The controlling agreements provide that this dispute is subject to arbitration, that the arbitrators have "exclusive jurisdiction" over the "entire matter in dispute," and that only the Courts in New York may address the issue of arbitrability. Exhibit A. Accordingly, AHAC is preparing a motion to compel arbitration to be filed forthwith in the United States District Court for the Southern District of New York. AHAC files this motion to stay this action (including the preliminary injunction motion) pending a ruling from the New York court.

In the alternative, AHAC requests an opportunity to fully respond to the preliminary injunction motion to show why this entire matter should be submitted to arbitration and, moreover, why injunctive relief is not appropriate in any event.

2

**A.    This Court Should Stay This Action Pending a Decision by the United States District Court for the Southern District of New York on AHAC's Motion to Compel Arbitration That Will Be Filed Forthwith.**

The Complaint alleges causes of action that may only be heard pursuant to arbitration clauses in the signed, written agreements annexed hereto as Exhibits A, B and C.  Exhibit A is a Payment Agreement effective as of November 1, 2004 (the "2004 Payment Agreement"), which contains the following broad arbitration clause (the "Arbitration Clause"):

> What if we disagree about payment due?  If you disagree with us about any amount of Your Payment Obligation that we have asked You to pay, within the time allowed for payment You must:
>
> - give us written particulars about the items with which You disagree; and
>
> - pay those items with which You do not disagree.
>
> We will review the disputed items promptly and provide You with further explanations, details, or corrections.  You must pay us the correct amounts for the disputed items within 10 days of agreement between You and us about their correct amounts.  **Any disputed items not resolved within 60 days after our response to Your written particulars must immediately be submitted to arbitration as set forth below.**  With our written consent, which shall not be unreasonably withheld, You may have reasonable additional time to evaluate our response to Your written particulars.
>
> So long as You are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of Your Payment Obligation.
>
> What about disputes other than disputes about payment due?

> **Any other unresolved dispute arising out of this Agreement must be submitted to arbitration.** You must notify us in writing as soon as You have submitted a dispute to arbitration. We must notify You in writing as soon as we have submitted a dispute to arbitration.

Exhibit A, page 8 (emphasis added).

The Arbitration Clause further provides that the arbitrators "will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability" (the "Exclusive Jurisdiction Clause"). Exhibit A, p. 9.

The parties also executed a "2004 Addendum to Payment Agreement," which specifically provides that motions to compel or stay arbitration be brought in the City, County and State of New York (the "Forum Clause") as follows:

> How arbitrators must be chosen: You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. **Similarly, any action or proceeding concerning arbitrability including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.**

Exhibit A, 2004 Addendum to Payment Agreement (emphasis added).

The parties entered into another Payment Agreement effective as of January 26, 2006 (the "2006 Payment Agreement"). The 2006 Payment Agreement contains the identical Arbitration Clause and the identical Exclusive Jurisdiction Clause set forth in Exhibit A -- the 2004 Payment Agreement. See Exhibit B, p. 8. Likewise, the parties entered into a "2004 Addendum to Payment Agreement" effective as of January 26, 2006,

which contains the identical Forum Clause set forth in Exhibit A. <u>See</u> Exhibit B. Finally, the parties entered into a Schedule of Policies and Payments with an addendum titled "2006 Addendum to Payment Agreement" effective as of November 1, 2006. <u>See</u> Exhibit C.

Pursuant to the Forum Clause in Exhibits A and B, Defendants are filing forthwith a motion to compel arbitration in the United States District Court for the Southern District of New York. Defendants therefore request that this Court stay all proceedings until after the New York Court determines arbitrability and, in the event the New York Court orders arbitration, until the conclusion of such arbitration, pursuant to Section 3 of the Federal Arbitration Act ("FAA"), which provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

The New York Court will be asked to recognize that the FAA creates "a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." <u>Moses H. Cone Mem'l. Hosp. v. Mercury Const. Corp.</u>, 460 U.S. 1, 24 (1983). By enacting the FAA, Congress sought to guarantee that arbitration agreements are enforced as written and to prevent parties from avoiding their contractual obligations to

arbitrate. See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 219-21 (1985); see also, Randolph v. Green Tree Fin. Corp., 244 F.3d 814, 818-19 (11th Cir. 2001) ("According to the Supreme Court, the last time this case was before us we made the mistake of giving too little weight to the FAA's pro-arbitration policy. We decline to make the same mistake again.").

The Eleventh Circuit has consistently followed the principle that "[a]ny doubts arising out of the construction of the contract language concerning the scope of arbitrable issues should be construed liberally to favor arbitration." Blue Gray Corps. I & II v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 921 F.2d 267, 271 (11th Cir. 1991); Blinco v. Green Tree Servs. LLC, 400 F.3d 1308, 1311 (11th Cir. 2005) (quoting Moses H. Cone for same proposition); Jenkins v. First American Cash Advance of Georgia, 400 F.3d 868, 874 (11th Cir. 2005) (recognizing the "liberal federal policy" favoring arbitration agreements); Klay v. All Defendants, 389 F.3d 1191, 1200 (11th Cir. 2004) (citing Moses H. Cone for the proposition that questions of arbitrability must be addressed with a "healthy regard for the federal policy favoring arbitration").

Likewise, United States District Courts in New York have ordered arbitration under similar agreements. See, e.g., Raytheon v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 306 F. Supp. 2d 346 (S.D.N.Y. 2004) and Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Champps Entm't, Inc., No. 04 Civ. 6163 (NRB), 2004 U.S. Dist. Lexis 25052 (S.D.N.Y. Dec. 13, 2004).

### III.    CONCLUSION

WHEREFORE, for the foregoing reasons this Court should stay this action pursuant to 9 U.S.C. § 3 pending a decision from the United States District Court for the Southern District of New York on AHAC's motion to compel arbitration.

### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 3.01(g)

Pursuant to Local Rule 3.01(g), undersigned counsel for AHAC certifies that they have conferred with counsel for Plaintiff, who advises that Plaintiff does not consent to the relief requested herein.

Dated January 23, 2008                    Respectfully submitted,

                                          /s/ Nancy Faggianelli
                                          Nancy Faggianelli (FBN: 347590)
                                          nfaggianelli@carltonfields.com
                                          Christopher M. Sacco (FBN: 557420)
                                          csacco@carltonfields.com
                                          Carlton Fields, P.A.
                                          P. O. Box 3239
                                          Tampa, FL 33601
                                          Tel. (813) 223-7000
                                          Fax. (813) 229-4133

                                          ZEICHNER ELLMAN & KRAUSE LLP
                                          Michael S. Davis
                                          Anthony I. Giacobbe, Jr.
                                          575 Lexington Avenue
                                          New York, NY 10022
                                          Tel: (212) 223-0400
                                          Fax: (212) 753-0396

                                          *Counsel for American Home*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this the 23rd day of January 2008, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Michael P. Brundage (mbrundage@jennisbowen.com)

Andrew W. Lennox (alennox@jennisbowen.com)

/s/ Nancy Faggianelli

*EXHIBIT  A*

# PAYMENT AGREEMENT

For

## Insurance and Risk Management Services

effective on the 01 day of November, 2004

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company

And *You*, our Client

**CIRCLE L ROOFING INC**
**6320 VENTURE DR STE 205**
**BRADENTON   FL  34202-5132**

in consultation with *Your* representative

**HOBBS GROUP INC**
**6771 Professional Parkway West**
**Sarasota  FL  34240**

# PAYMENT AGREEMEI

## TABLE of CONTENTS

Title Page ........................................................................................ 1

Table of Contents ........................................................................... 2

Who Has Agreed To This Agreement? ......................................... 3

What Have *You* And We Agreed To? ............................................ 3

When Does This Agreement Begin? .............................................. 3

When Will This Agreement End? ................................................... 3

Which Words Have Special Meanings In This Agreement? ........... 3

What Else Should *You* Know About *Your Payment Obligation*? ..... 4

When Must *You Pay Your Payment Obligation*? ........................... 4

What Is the Payment Plan? ............................................................ 4

What Is the Billing Method? ........................................................... 5

What About Collateral? ................................................................. 6

What Is Default? ............................................................................ 7

What May We Do In Case Of Default? ........................................... 7

How Will Disagreements Be Resolved? ......................................... 8

To Whom Must *You* and We Give Notices? ................................. 9

May Rights or Obligations be Assigned? ....................................... 9

Will Past Forbearance Waive Rights under This Agreement? ........ 9

Who Must Pay to Enforce This Agreement? .................................. 9

How May This Agreement Be Changed? ....................................... 9

What If the Law Changes? ............................................................. 9

Are *You* Authorized to Make This Agreement? ........................... 9

Signatures ..................................................................................... 10

Schedule of Policies and Payments ...................................... Appended

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:

- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- us, the Insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the Insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

We have agreed to the following:

- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,

*You* have agreed to the following:

- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any *Policies* and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. "ALAE" means Allocated Loss Adjustment Expense as defined in the *Policies*.

2. "Deductible Loss Reimbursements" means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.

3. "Loss" or "Losses" means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.

4. "Policy" or "Policies" means:

   - any of the insurance *Policies* described by their *Policy* numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement.

5. "Retained Amount" or "Retention" means one of the following:

   - Self-Insured Retention: the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - Deductible: the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - Loss Limit: the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

Edition 12/98 A

## PAYMENT AGREEMENT

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You"** or **"Your"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance *Policies* and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

- the premiums and premium surcharges,

- *Deductible Loss Reimbursements,*

- any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,

- any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION?*

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance *Policies* and agreements between us. *You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to *You* whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance *Policies* to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the *Policy* year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to *You* under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement.

A Credit Fee may be charged for any unsecured credit extended to *You*. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the *Policy* year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements.*

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION?*

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## WHAT IS THE PAYMENT PLAN?

# PAYMENT AGREEME

## Deposit and Installments

You must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to You when You have paid us all amounts due us.

If the total amount of claims we shall have paid on Your behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require You to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

## Additional Payments

You must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

# WHAT IS THE BILLING METHOD?

**Deposit and Installments:** You must pay us the amounts shown in the *Schedule* as "Installments". You must pay us those amounts by their Due Dates shown there.

**Additional Payments:** You have chosen the Direct Billing Method or the Automatic Withdrawal Method, or a combination of both. Your choice is shown in the *Schedule*.

## Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill You as necessary for the payment of *Losses* we must pay or have paid within Your *Retention* and Your share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

## Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within Your *Retention* and Your share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*. You hereby authorize us to withdraw funds from that Account upon our demand.

You must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within Your *Retention* and Your share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". You must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to You.

# PAYMENT AGREEMENT

## WHAT ABOUT COLLATERAL?

### Collateral is Required

You must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance *Policies* or agreements to *Your Payment Obligation*.

### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation*. *You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*. If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies*. If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*,

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,

4. any material adverse change in the financial condition of *You*, *Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that *You* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to *Your* primary casualty insurance with us.

## Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request. If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement,
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

## Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is a Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

## WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *Your* insolvency, or the occurrence of any of the following:

   - the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

   - *Your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *You*, without our prior consent, of any *Policy* material to this agreement. However, *Your* concurrent cancellation of all the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

## WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

Edition 12/98 A

# PAYMENT AGREEMENT

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligations* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. You must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of yours received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. You authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and
- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. You must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

# PAYMENT AGREEMENT

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof. You and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless You and we consent to an extension. The majority decision of any two arbitrators, when filed with You and us will be final and binding on You and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order You to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

*Expenses of Arbitration:* You and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration. This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to You at Your address in the *Schedule*. You must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither You nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If You or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either You or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by You and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

You hereby represent and warrant that Your execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on Your behalf has full right and authority to execute and deliver this agreement and to bind You jointly and severally.

# PAYMENT AGREEME...

## SIGNATURES

TO SIGNIFY AGREEMENT, You and we have caused this Agreement to be executed by the duly authorized representatives of each.

For National Union Fire Insurance Company of Pittsburgh, Pa.,

On behalf of itself and its affiliates first listed above:

In New York, New York,

This _31st_ day of _March_, _2005_

Signed by _____

Typed Name _Seymour Hall_

Title _Authorized Representative_

For You, our Client

### CIRCLE L ROOFING INC

In _Sarasota County_, _FL_

This _21_ day of _March_, _2005_

Signed by _____

Typed Name _Stacy S. Evans_

Title _President_

2004 Addendum

to

**PAYMENT AGREEMENT**

**By and between us**

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Vermont
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company

(Company, "we", "us" or "our")

and *You*, our Client

Circle L Roofing, Inc

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the first day of November 2004 .

1.  The section entitled WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation, is deleted and replaced with the following:

"**Your Payment Obligation**" means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof.  Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

*   the premiums and premium surcharges, taxes and assessments,
*   *Deductible Loss Reimbursements*,
*   any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,
*   any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

- costs and expenses incurred by any third party administrator.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Premium Tax on Deductibles:** If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense, or to pay *Us* the premium taxes and assessments. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments and *You* have not paid *Us* for these taxes and assessments in advance, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies*. If *You* have paid *Us* the taxes and/or assessments and *We* unsuccessfully contest the claim, *You* will not be liable to *Us* for any related fines, penalties or interest. If *We* successfully contest the claim, the taxes and/or assessments *You* paid in advance will be refunded to *You*. Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule*.

2. The section entitled: WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION? is amended to include the following:

We will contract with a Third Party Administrator (TPA) that you select for the adjustment of your claims under the *Policies* provided that we consent to your selection in advance. Our relationship with the TPA will be governed by a claims service agreement between us and the TPA, a copy of which will be made available to you upon your request. Any TPA you select must meet all of our licensing requirements. You will be responsible for any costs associated with any change from one TPA to another TPA that we or you make at any time. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on your behalf shall be considered part of *Your* Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

3. The section entitled: WHEN MUST *YOU* PAY *YOUR* PAYMENT OBLIGATION? is amended to include the following:

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

4. The section entitled: WHAT ABOUT COLLATERAL? is amended to include the following:

Collateral Exchange:

At our sole discretion we may approve Your substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve your substitution or exchange of collateral if you are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

5. The section entitled: HOW WILL DISAGREEMENTS BE RESOLVED?, ARBITRATION PROCEDURES – How arbitrators must be chosen, is deleted and replaced by the following:

How arbitrators must be chosen: You must chose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

   **IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives in _____, _____ this ____ day of _____,_____.''

**For National Union Fire Insurance Company of Pittsburgh, Pa.,**
**On behalf of itself and its affiliates first listed above:**

In New York, New York,

This _31st_ day of _March_, 2004.

Signed by _____

Typed Name Geoffrey Hall

Title Authorized Representative

**For You, our Client**

In _Sarasota County_, _FL_,

This _21_ day of _March_ 2005

Signed by _____

Typed Name _James S. Lynn_

Title _President_

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 11/01/2004 to 11/01/2005

Annexed to the PAYMENT AGREEMENT

effective on 11/01/2004

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**
**American International Pacific Insurance Company**
**Granite State Insurance Company**
**Landmark Insurance Company**
**National Union Fire Insurance Company of Louisiana**
**New Hampshire Insurance Company**
and You, our Client

**CIRCLE L ROOFING INC**
**6320 VENTURE DR STE 205**
**BRADENTON   FL  34202-5132**

on behalf of You and all Your subsidiaries or affiliates except those listed below:

For our use only: 837850

## List of Addressees for Notices and Other Purposes

**Your Address:**

Contact Name:
Company Name: CIRCLE L ROOFING INC
Street: 6320 VENTURE DR STE 205
City: BRADENTON          State: FL          Zip: 34202-5132 Phone:

**Your Representative:**

Contact Name: Connie Harding
Company Name: HOBBS GROUP INC
Street: 6771 Professional Parkway West
City: Sarasota          State: FL          Zip: 34240          Phone: (941) 544-3120

**Our Account Executive:**

Contact Name: E. R. Sanders, CPCU
Company Name: American International Group
Street: 1200 Abernathy Road Building 600
City: Atlanta          State: GA          Zip: 30356 2594 Phone: 770 671 2284

**Our Law Representative:**

Contact Name: Peter H. Recksett
Company Name: American International Group
Street: 160 Water Street
City: New York          State: NY          Zip: 10038          Phone: 212 820 4540

**Remit Payments to:**

Contact Name:
Company Name: American International Companies
Street: PO Box 10472
City: Newark          State: NJ          Zip: 07193          Phone:

**Remit Collateral to:**

Contact Name: Attn: Mr. Art Stillwell
Company Name: American International Group Inc.
Street: P.O.Box 923 Wall Street Station
City: New York          State: NY          Zip: 10268          Phone: 212 770 8428

Contact Name:
Company Name:
Street:
City:          State:          Zip:          Phone:

Contact Name:
Company Name:
Street:
City:          State:          Zip:          Phone:

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

WC 7185890.

Commercial General Liability Insurance

GL 8283109.

Automobile Liability Insurance

CA 8261876.

Other Insurance

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | Your Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| 1 | 11/01/2004 | $384,891 | $0 | $0 | $35,000 | $419,891 |
| 2 | 12/01/2004 | $128,297 | $0 | $0 | $0 | $128,297 |
| 3 | 01/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 5 | 03/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 6 | 04/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 4 | 02/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 7 | 05/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 8 | 06/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 9 | 07/01/2005 | $128,297 | $0 | $0 | $0 | $128,297 |
| 10 | 08/01/2005 | $128,296 | $0 | $0 | $0 | $128,296 |
| | Subtotals | $1,539,563 | $0 | $0 | $35,000 | $1,574,563 |
| | DLP* | N/A | N/A | N/A | $1,185,000 | $1,185,000 |
| | DEP* | $0 | $0 | $0 | N/A | $0 |
| | Totals | $1,539,563 | $0 | $0 | $1,220,000 | $2,759,563 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

**Notes**

(1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your share* of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a **Monthly** basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$0**, *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

☒ *You* at *Your* address shown in the *Schedule*, or

☐ *Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

### 4. Conversion

The Conversion Date for each *Policy* described in section A above shall be the date **18** months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| N/A | N/A |
| Total Collateral on Hand | $0 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| CLAIMS PAYMENT FUND | $35,000 | 11/01/2004 |
| LETTER OF CREDIT | $1,250,000 | 11/01/2004 |
| OTHER | $22,500 | 11/01/2004 |
| Total Additional Collateral Required | $1,307,500 | |
| Total Collateral Required | $1,307,500 | |

### 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity:  Type of Debt Rated:

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
| AA- | Aa3     |                            |
| A-  | A3      |                            |
| BBB | Baa2    |                            |
| BB  | Ba2     |                            |

b. Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under Item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.,** on behalf of itself and all its affiliates, this _31_ day of _____ 2005

Signed by _____

Typed Name George Hall

Title **Authorized Representative**

*For You:* CIRCLE L ROOFING INC

this _21_ day of _March_ , _2005_

Signed by _____

Typed Name _____

Title _President_

*EXHIBIT  B*

# PAYMENT AGREEMENT

For

## Insurance and Risk Management Services

effective on the 26 day of January, 2006

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**
**American International Pacific Insurance Company**
**Granite State Insurance Company**
**Landmark Insurance Company**
**National Union Fire Insurance Company of Louisiana**
**New Hampshire Insurance Company**

And *You*, our Client

*CIRCLE L ROOFING INC*
*6320 VENTURE DR STE 205*
*BRADENTON  FL  34202-5132*

In consultation with *Your* representative

*HILB ROGAL HAMILTON INSURANCE*
*7000 CENTRAL PARKWAY # 700*
*ATLANTA  GA  30328*

# PAYMENT AGREEMENT

## TABLE of CONTENTS

| | |
|---|---|
| Title Page | 1 |
| Table of Contents | 2 |
| Who Has Agreed To This Agreement? | 3 |
| What Have You And We Agreed To? | 3 |
| When Does This Agreement Begin? | 3 |
| When Will This Agreement End? | 3 |
| Which Words Have Special Meanings In This Agreement? | 3 |
| What Else Should You Know About *Your Payment Obligation*? | 4 |
| When Must *You* Pay *Your Payment Obligation*? | 4 |
| What Is the Payment Plan? | 4 |
| What Is the Billing Method? | 5 |
| What About Collateral? | 6 |
| What Is Default? | 7 |
| What May We Do In Case Of Default? | 7 |
| How Will Disagreements Be Resolved? | 8 |
| To Whom Must You and We Give Notices? | 9 |
| May Rights or Obligations be Assigned? | 9 |
| Will Past Forbearance Waive Rights under This Agreement? | 9 |
| Who Must Pay to Enforce This Agreement? | 9 |
| How May This Agreement Be Changed? | 9 |
| What If the Law Changes? | 9 |
| Are *You* Authorized to Make This Agreement? | 10 |
| Signatures | |
| Schedule of Policies and Payments | Appended |

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:

- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- us, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

We have agreed to the following:

- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,

*You* have agreed to the following:

- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any *Policies* and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. "ALAE" means Allocated Loss Adjustment Expense as defined in the *Policies*.

2. "Deductible Loss Reimbursements" means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.

3. "Loss" or "Losses" means damages, benefits or indemnity that we become obligated under the terms of the *Policies* to pay to claimants.

4. "Policy" or "Policies" means:

   - any of the insurance *Policies* described by their *Policy* numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement.

5. "Retained Amount" or "Retention" means one of the following:

   - Self-Insured Retention: the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - Deductible: the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - Loss Limit: the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

# PAYMENT AGREEMENT

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You"** or **"Your"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance *Policies* and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   - the premiums and premium surcharges,
   - *Deductible Loss Reimbursements*,
   - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,
   - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

   **Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION*?

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance *Policies* and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to *You* whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance *Policies* to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended to *You* for the duration of the *Policy* year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to *You* under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement. A Credit Fee may be charged for any unsecured credit extended to *You*. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the *Policy* year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION*?

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## WHAT IS THE PAYMENT PLAN?

# PAYMENT AGREEMENT

## Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

Claims Payment Deposit: If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

## Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

# WHAT IS THE BILLING METHOD?

Deposit and Installments: *You* must pay us the amounts shown in the *Schedule* as "Installments". *You* must pay us those amounts by their Due Dates shown there.

Additional Payments: *You* have chosen the Direct Billing Method or the Automatic Withdrawal Method, or a combination of both. *Your* choice is shown in the *Schedule*.

## Direct Billing Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

## Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*. *You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your Retention* and *Your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

# PAYMENT AGREEMENT

## WHAT ABOUT COLLATERAL?

### Collateral is Required

You must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance *Policies* or agreements to *Your Payment Obligation*.

### Grant of Security Interest and Right to Offset

You grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable to *You* and are now or may in the future come into our possession in connection with *Your Payment Obligation*. *You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* direct us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

### Letter of Credit

Any letter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*.

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies*. If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1. the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2. the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*,

3. the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,

4. any material adverse change in the financial condition of *You*, *Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that You must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to *Your* primary casualty insurance with us.

## Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request. If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement,
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

## Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is a Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

## WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *Your* insolvency, or the occurrence of any of the following:

    - the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by You for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

    - *Your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *You*, without our prior consent, of any *Policy* material to this agreement. However, *Your* concurrent cancellation of all the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

## WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

## PAYMENT AGREEMENT

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligations* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of yours received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. *You* authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and

- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do In Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

# PAYMENT AGREEMENT

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof. You and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless You and we consent to an extension. The majority decision of any two arbitrators, when filed with You and us will be final and binding on You and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order You to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

*Expenses of Arbitration:* You and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to You at Your address in the *Schedule*. You must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule*. All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither *You* nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *You* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *You* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *You* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

*You* hereby represent and warrant that *Your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *Your* behalf has full right and authority to execute and deliver this agreement and to bind *You* jointly and severally.

# PAYMENT AGREEMENT

## SIGNATURES

TO SIGNIFY AGREEMENT, You and we have caused this Agreement to be executed by the duly authorized representatives of each.

For National Union Fire Insurance Company of Pittsburgh, Pa.,

On behalf of itself and its affiliates first listed above:

In New York, New York,

This 25th day of April 2006

Signed by _____

Typed Name Geoffrey Hall

Title Authorized Representative

For You, our Client

**CIRCLE L ROOFING INC**

In _BRADENTON_ _FL_

This 24 day of APRIL 2006

Signed by _____

Typed Name RICKY M LYNN

Title CEO

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 01/26/2006 to 11/01/2006

Annexed to the PAYMENT AGREEMENT

effective on 01/26/2006

by and between us,

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company

The Insurance Company of the State of Pennsylvania

National Union Fire Insurance Company of Pittsburgh, Pa.

Commerce and Industry Insurance Company

Birmingham Fire Insurance Company

Illinois National Insurance Company

American International South Insurance Company

AIU Insurance Company

American International Pacific Insurance Company

Granite State Insurance Company

Landmark Insurance Company

National Union Fire Insurance Company of Louisiana

New Hampshire Insurance Company

and You, our Client

**CIRCLE L ROOFING INC**

**6320 VENTURE DR STE 205**

**BRADENTON  FL  34202-5132**

on behalf of You and all Your subsidiaries or affiliates except those listed below:

For our use only: 663166

## List of Addressees for Notices and Other Purposes

**Your Address:**

Contact Name:
Company Name: CIRCLE L ROOFING INC
Street: 6320 VENTURE DR STE 205
City: BRADENTON    State: FL    Zip: 34202-5132 Phone:

**Your Representative:**

Contact Name: John L Lubatti, CPCU, ARM, ARe
Company Name: HILB ROGAL HAMILTON INSURANCE
Street: 7000 CENTRAL PARKWAY # 700
City: ATLANTA    State: GA    Zip: 30328    Phone: (404) 942-5122

**Our Account Executive:**

Contact Name: E. R. Sanders, CPCU
Company Name: American International Group
Street: 1200 Albernathy Road Building 6000
City: Atlanta    State: GA    Zip: 30328    Phone: 770 671 2284

**Our Law Representative:**

Contact Name: Peter H. Recksett
Company Name: American International Group
Street: 160 Water Street
City: New York    State: NY    Zip: 10037    Phone: 212 820 4540

**Remit Payments to:**

Contact Name:
Company Name: American International Companies
Street: PO Box 10472
City: Newark    State: NJ    Zip: 07193    Phone:

**Remit Collateral to:**

Contact Name: Attn: Mr. Art Stillwell
Company Name: American International Group Inc.
Street: P.O.Box 923 Wall Street Station
City: New York    State: NY    Zip: 10268    Phone:

Contact Name:
Company Name:
Street:
City:    State:    Zip:    Phone:

Contact Name:
Company Name:
Street:
City:    State:    Zip:    Phone:

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

**WC 1361319.**

Commercial General Liability Insurance

**GL 1757943.**

Automobile Liability Insurance

**CA 8262290.**

Other Insurance

Other Agreements (Describe)

The billing for the loss conversion factor (141,257) will occur monthly based upon the paid losses.

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | Your Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| 1 | 01/26/2006 | $2,022,781 | $0 | $0 | $47,694 | $2,070,475 |
| Subtotals | | $2,022,781 | $0 | $0 | $47,694 | $2,070,475 |
| DLP* | | N/A | N/A | N/A | $1,365,706 | $1,365,706 |
| DEP* | | $141,257 | $0 | $0 | N/A | $141,257 |
| Totals | | $2,164,038 | $0 | $0 | $1,413,400 | $3,577,438 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| 07/31/2007 | Non LRRP-WCThe Entire Contract | $141,257 |

Notes    (1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a **Monthly** basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such

Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of __$0__. *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

    ☒ *You* at *Your* address shown in the *Schedule*, or

    ☐ *Your Representative* at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:

Name of Depository Institution:

Address:

Account Number:

4. **Conversion**

The Conversion Date for each *Policy* described in section A above shall be the date __16__ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Escrow | $35,000 |
| LOCs | $1,250,000 |
| Total Collateral on Hand | $1,285,000 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| LETTER OF CREDIT | $1,000,000 | 2006-01-26 |
| CLAIMS PAYMENT FUND | $47,694 | 2006-01-26 |
| Total Additional Collateral Required | $1,047,694 | |
| Total Collateral Required | $2,332,694 | |

### 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

    i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

    ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

Name of Entity:  Type of Debt Rated:

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
| AA- | Aa3     |                            |
| A-  | A3      |                            |
| BBB | Baa2    |                            |
| BB  | Ba2     |                            |

b.  Other Financial Tests or Covenants:

3.  **Adjustment of Credit Fee**

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.**, on behalf of itself and all its affiliates,

this 25 day of April 2006

Signed by _____

Typed Name Geoffrey Hall

Title Authorized Representative

For You: **CIRCLE L ROOFING INC**

this 12th day of APRIL, 2006

Signed by _____

Typed Name JEROME LYNN

Title VICE

## 2004 Addendum

### to

## PAYMENT AGREEMENT

**By and between us**

National Union Fire Insurance Company of Pittsburgh, Pa.
On behalf of itself and all its affiliates including, but not limited to:
American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Vermont
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company

(Company, "we", "us" or "our")

and *You*, our Client

*CIRCLE L ROOFING INC*
*6320 VENTURE DR STE 206*
*BRADENTON FL 34202-5132*

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the 28th day of January, 2006.

1. The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation** is deleted and replaced with the following:

   "**Your Payment Obligation**" means the amounts that You must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incepted before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

   - the premiums and premium surcharges, taxes and assessments,
   - *Deductible Loss Reimbursements*,
   - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which you are a self-insurer,
   - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.
   - costs and expenses incurred by any third party administrator.

   **Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and



**HRH.**

hilb rogal & hobbs

6771 Professional Parkway West
Suite 101
Sarasota, FL 34240
℡   941-554-3140
⅂    941-554-3090
⊔    www.hrh.com

April 18, 2006

Ms. Jill Puterbaugh
Account Service Manager
AI Construction Risk Management
1200 Abernathy Road, NE Bldg 600, 7th Floor
Atlanta, GA 30328

RE:    Circle L Roofing, Inc.
       Payment Agreement

Dear Jill:

Enclosed please find attached 4 original, signed Payment Agreements for the above-captioned.  Please contact me if you have any questions or concerns.

Best regards,

Angela M. Stubbs
Business Account Specialist

Enclosures

*EXHIBIT  C*

# AIG Construction Risk Management

**A Division of American International Companies**
1200 Abernathy Road, N. E., Building 600
Atlanta, Georgia 30358

December 12, 2006

Loretta Ector
Underwriting Technician
Phone 770-671-2347
Fax    770-399-4079

AIG Construction Risk Management
175 Water Street, 6th Floor
New York NY 10038

Attn: Geoffrey Hall

RE: Circle L Roofing Inc

Effective Date: November 01, 2006

Geoffrey the Schedule of Polices and Payments is enclosed.



Sincerely,



L Ector

CC: Elvira Sanders- Underwriting Consultant



# Schedule of Policies and Payments

## Incurred Loss Payments Plan

Effective from 11/01/2006 to 11/01/2007

Annexed to the PAYMENT AGREEMENT

effective on 11/01/2006

by and between us.

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

American Home Assurance Company

The Insurance Company of the State of Pennsylvania

National Union Fire Insurance Company of Pittsburgh, Pa.

Commerce and Industry Insurance Company

Birmingham Fire Insurance Company

Illinois National Insurance Company

American International South Insurance Company

AIU Insurance Company

American International Pacific Insurance Company

Granite State Insurance Company

Landmark Insurance Company

National Union Fire Insurance Company of Louisiana

New Hampshire Insurance Company

and *You*, our Client

**CIRCLE L ROOFING INC**
**9009 TOWN CENTER PARKWAY**
**BRADENTON  FL  34202-5132**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 653151

---

## List of Addressees for Notices and Other Purposes

**Your Address:**

Contact Name:
Company Name: CIRCLE L ROOFING INC
Street: 9009 TOWN CENTER PARKWAY
City: BRADENTON    State: FL    Zip: 34202-5132 Phone: (941) 907-7240

**Your Representative:**

Contact Name: Connie Harding
Company Name: HILB ROGAL HAMILTON INSURANCE
Street: 7000 CENTRAL PARKWAY # 700
City: ATLANTA    State: GA    Zip: 30328    Phone: (404) 942-5122

**Our Account Executive:**

Contact Name: E. R. Sanders, CPCU
Company Name: American International Group
Street: 1200 Albernathy Road Building 600
City: Atlanta    State: GA    Zip: 30328    Phone: 770 671 2284

**Our Law Representative:**

Contact Name: Peter H. Recksett
Company Name: American International Group
Street: 160 Water Street
City: New York    State: NY    Zip: 10037    Phone: 212 820 4540

**Remit Payments to:**

Contact Name:
Company Name: American International Companies
Street: PO Box 10472
City: Newark    State: NJ    Zip: 07193    Phone:

**Remit Collateral to:**

Contact Name: Attn: Mr. Donato DiLuzio
Company Name: American International Group Inc.
Street: P.O.Box 923 Wall Street Station
City: New York    State: NY    Zip: 10268    Phone:

Contact Name:
Company Name:
Street:
City:    State:    Zip:    Phone:

Contact Name:
Company Name:
Street:
City:    State:    Zip:    Phone:

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

**WC 7179593.**

Commercial General Liability Insurance

**GL 1792226.**

Automobile Liability Insurance

**CA 8262535.**

Other Insurance (describe):

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | Your Estimated Payment Obligation |
|---|---|---|---|---|---|---|
| 1 | 11/01/2006 | $2,342,318 | $0 | $7,500 | $0 | $2,349,818 |
| | Subtotals | $2,342,318 | $0 | $7,500 | $0 | $2,349,818 |
| | DLP* | N/A | N/A | N/A | $2,225,856 | $2,225,856 |
| | DEP* | $0 | $0 | $0 | N/A | $0 |
| | Totals | $2,342,318 | $0 | $7,500 | $2,225,856 | $4,575,674 |

DLP means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Additional Payments" described below.

DEP means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

Notes

(1) "Provision for Expenses and Excess Losses" is a part of the Premium. The remainder of the Premium is included under "Provision for Limited Losses".

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

*You* must pay us the installment amounts by the due dates as specified in Section B.1. We have calculated the part of those installments designated as "Provision for Limited Losses" to equal the *Losses* within *Your Retention* and *Your* share of *ALAE* that we expect to incur during the period for which Provision for Limited Losses amounts are shown in Section B.1. For the purposes of this *Schedule*, the amount we incur will be the sum of the amounts we pay and the amounts we reserve for payment on claims that have been reported to us, but shall not include our reserves for *Losses* that have been incurred but have not been reported to us.

By the end of that period,

- we will determine the actual amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we have incurred under the *Policies*, and

- If we have incurred more for *Loss* within *Your Retention* and *Your* share of *ALAE* under the *Policies* than the sum that *You* have paid us as Provision for Limited Losses, *You* must upon our demand pay us the difference, or

- If we have incurred less for *Loss* within *Your Retention* and *Your* share of *ALAE* under the *Policies* than the sum that *You* have paid us as Provision for Limited Losses, we will credit the difference against *Your* subsequent obligation to pay us as described below; and

- we will calculate the amount of *Losses* within *Your Retention* and *Your* share of *ALAE* that we expect to incur during the next annual period. We will notify *You* of the due date and amount of each subsequent payment due us during the next annual period.

We will repeat this procedure at the end of each subsequent annual period until Conversion.

Billing Method:

    ☒ Billing to
        ☒ *You* at *Your* address shown in the *Schedule*, or
        ☐ *Your* Representative at its address shown in the *Schedule*; or

    ☐ Automatic Withdrawal from the account described below.

    If Automatic Withdrawal Account applies: Minimum Amount:

    Name of Depository Institution:

    Address:

    Account Number:

**4. Conversion**

The Conversion Date for each *Policy* described in section A above shall be the date __18__ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

## C. Security Plan

### 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Escrow | $82,694 |
| LOCs | $2,250,000 |
| Total Collateral on Hand | $2,332,694 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Cash Security (Cash Collateral) | $556,464 | 2006-11-01 |
| Cash Security (Cash Collateral) | $278,232 | 2006-12-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-01-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-02-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-03-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-04-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-05-01 |
| Total Additional Collateral Required | $2,225,856 | |

| Total Collateral Required | $4,558,550 |
|---|---|

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

 i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

 ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

*Name of Entity:  Type of Debt Rated:*

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|---|---|---|
| | | |
| | | |
| | | |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|---|---|---|
| | | |
| | | |

b. Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.**, on behalf of itself and all its affiliates,

this 13th day of Dec. 2006

Signed by _____

Typed Name Geoffrey Hall

Title **Authorized Representative**

For *You*: CIRCLE L ROOFING INC

this 1st day of DECEMBER, 2006

Signed by _____

Typed Name STEVEN J. LYNN

Title PRESIDENT

## 2006 Addendum

### to

## PAYMENT AGREEMENT

**By and between us**

**National Union Fire Insurance Company of Pittsburgh, Pa.**

**On behalf of itself and all its affiliates including, but not limited to:**

**American Home Assurance Company**

**The Insurance Company of the State of Pennsylvania**

**National Union Fire Insurance Company of Vermont**

**National Union Fire Insurance Company of Pittsburgh, Pa.**

**Commerce and Industry Insurance Company**

**Birmingham Fire Insurance Company**

**Illinois National Insurance Company**

**American International South Insurance Company**

**AIU Insurance Company**

**Granite State Insurance Company**

**New Hampshire Insurance Company**

**(Company, "we", "us" or "our")**

**and *You*, our Client**

***CIRCLE L ROOFING INC***
***9009 TOWN CENTER PARKWAY***
***BRADENTON  FL  34202-5132***

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the **first** day of **November, 2006**

1.  The section entitled **WHO HAS AGREED TO THIS AGREEMENT?**, is deleted and replaced with the following:

    This Agreement is between:

    - *You*, the organization(s) named as "our Client" in the *Schedule*, and

    - *us*, the insurers set forth above as "Company" "we," "us" and "our" in this Addendum.

2.  The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation**, is deleted and replaced with the following:

    "**Your Payment Obligation**" means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    - the premiums and premium surcharges, taxes and assessments,

    - *Deductible Loss Reimbursements*,

    - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,

    - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

    - costs and expenses incurred by any third party administrator.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Premium Tax on Deductibles:** If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies*. Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule*.

3. The section entitled: **WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?** is amended to include the following:

   We will contract with a Third Party Administrator (TPA) that you select for the adjustment of your claims under the *Policies* provided that we consent to your selection in advance. Our relationship with the TPA will be governed by a claims service agreement between us and the TPA, a copy of which will be made available to you upon your request. Any TPA you select must meet all of our licensing requirements. You will be responsible for any costs associated with any change from one TPA to another TPA that we or you make at any time. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on your behalf shall be considered part of *Your Payment Obligation*, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

4. The section entitled: **WHEN MUST YOU PAY YOUR PAYMENT OBLIGATION?** is amended to include the following:

   All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

5. The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the following:

   Collateral Exchange:

   At our sole discretion we may approve *Your* substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve your substitution or exchange of collateral if you are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

6. The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED? ARBITRATION PROCEDURES - How Arbitrators Must Be Chosen**, is deleted and replaced with the following:

   How arbitrators must be chosen: You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of court of competent jurisdiction in the City, County, and State of New York.

7. The section entitled: **ARE YOU AUTHORIZED TO MAKE THIS AGREEMENT?** is amended to include the following:

This Agreement together with the Schedules, Addenda, Policies and any related agreements between *You* and *Us*, constitute the basis for a program of insurance coverage. We would not have entered into any of them without your agreement on all of them. For that reason, you should review all such documents together when making any accounting, tax or legal determinations relating to the insurance program.

**IN WITNESS WHEREOF**, the parties hereto have caused this Addendum to be executed by their duly authorized representatives.

For National Union Fire Insurance Company of Pittsburgh, Pa.,

On behalf of itself and its affiliates first listed above:

In New York, New York,

This _10th_ day of _Dec_, _2006_

Signed by : _[signature]_

Typed Name _George Hall_

Title **Authorized Representative**

For You, our Client

**CIRCLE L ROOFING INC**

In _BRADENTON_, _FL._

This _1st_ day of _December_, _06_

Signed by _[signature]_

Typed Name _JESSE L. LYNN_

Title _PRESIDENT_

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CIRCLE L. ROOFING, INC.,

      Plaintiff,

v.                                   CASE NO: 8:07-cv-2378-T-26TBM

AMERICAN INTERNATIONAL GROUP,
INC. and AMERICAN HOME ASSURANCE
COMPANY,

      Defendants.
_____/

## O R D E R

      Upon due consideration, it is ordered and adjudged that Plaintiff shall file a response to

Defendants' Motion to Stay on or before February 7, 2008.  Defendants are relieved of the

obligation to respond to Plaintiff's complaint or Plaintiff's Motion for Preliminary Injunction

until the Court has resolved the Motion to Stay.

      **DONE AND ORDERED** at Tampa, Florida, on January 24, 2008.


                                  *s/Richard A. Lazzara*
                                **RICHARD A. LAZZARA**
                                **UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO**:
Counsel of Record