UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


AMERICAN HOME ASURANCE COMPANY,      Case No. 8:cv-0874-RJS

        Petitioner,

vs.

CIRCLE L. ROOFING, INC.,

        Respondent.

_____/


### RESPONDENT'S RESPONSE IN OPPOSITION TO ORDER TO SHOW CAUSE AND INCORPORATED MEMORANDUM OF LAW

Respondent, CIRCLE L. ROOFING, INC., ("Circle L") a Florida Corporation, by and through its undersigned counsel, hereby responds in opposition to this Court's January 25, 2008 Order to Show Cause (the "Order"), why this Court should not order that all disputes, including the Injunction Motion, be submitted to arbitration in New York, and that the Florida case be stayed pending arbitration with AMERICAN INTERNATIONAL GROUP, INC. ("AIG") and AMERICAN HOME ASSURANCE COMPANY ("AHA" and collectively "Insurance Companies"), and states the following:

### BACKGROUND

1.    On December 31, 2007, Circle L filed a complaint against the Insurance Companies in the United States District Court for the Middle District of Florida (the "Florida Court")(Case No. 8:07-cv-2378-T-26TBM) (the "Florida Case").

2.    The Florida Case was filed in response to the egregious and inexcusable conduct of the Insurance Companies in knowingly withholding unearned premiums due

to Circle L under a workers' compensation insurance policy that was properly terminated by Circle L back in July 2007, and failing to return over $3,500,000 of cash that had been pledged as collateral (the "Cash Collateral") by Circle L to the Insurance Companies which is unquestionably the property of Circle L. The Insurance Companies have never given any explanation to Circle L as to why they have refused to refund the unearned premiums and as to why they continue to hold over $3,500,000 of Circle L's money now more than six months after the policy was terminated. The Insurance Companies' conduct has and continues to cause irreparable harm to Circle L as Circle L's business operations are at risk of being shut down because of severe cash flow shortages that could be eliminated if the Insurance Companies would simply return Circle L's money to it.

3.     As a result, Circle L filed a motion in the Florida Case seeking immediate mandatory injunctive relief (the "Injunction Motion") against the Insurance Companies for the immediate return of the Cash Collateral. Unless the Florida Court grants injunctive relief, Circle L will very likely financially collapse.

4.     In response to Circle L's Injunction Motion, the Insurance Companies try to deflect attention from their bad faith conduct and argue that under the terms of the terminated insurance contract this "dispute" must be arbitrated in New York. As part of their tactic, the Insurance Companies filed two motions seeking to stay and abate the Florida Case, as well as filing a Petition for Arbitration before this Honorable Court.

5.     The facts before both courts are not disputed. For many months, Circle L attempted in good faith to obtain the refund of the unearned premium and the return of the Cash Collateral. Never once did the Insurance Companies even suggest that a dispute existed as to these requests. Instead, the Insurance Companies simply kept stalling and

indicating as to the unearned premium that the refund was "on the way" or had already been sent. As to the Cash Collateral, although the policy was terminated effective July 1, 2007 (more than six months ago), the Insurance Companies still have not provided any justification, contractual or otherwise, as to how they have the right to continue to keep approximately $3,500,000 of Circle L's money.

6.     In fact, the Insurance Companies represented to the Florida Office of Insurance Regulation in a letter dated October 29, 2007 (copy attached) that a refund of the unearned premium in the amount of $760,073 had been calculated as a result of an audit and that a $760,073 refund will be made to the premium finance company. This representation is simply not true. On January 31, 2008, about one month after the Florida Case was filed, six months after the policy was cancelled, and approximately three months after they said it will be made, a refund in the amount of $576,161.56 was received by Circle L's premium finance company.

7.     Circle L's position in this matter and in the Florida Case is straightforward. To the extent a right to arbitration existed, the Insurance Companies, as evidenced by their conduct to date, have waived any right to compel arbitration. Alternatively, even if it is determined that an arbitration should go forward, the Florida Court is permitted to, and indeed should grant the equitable relief sought pursuant to the Injunction Motion. To do otherwise would render the entire exercise of arbitration, to the extent it is justified, meaningless.

## MEMORANDUM OF LAW

Arbitration is a matter of contract between the parties, and the chief reason parties negotiate to include arbitration in their contracts is to provide an alternative method for dispute resolution that is speedier and less costly than litigation. B.L. Harbert Intern., LLC v. Hercules Steel Co., 441 F.3d 905 (11th Cir. 2006). In this case, the benefit bargained for by Circle L has been lost. The Insurance Companies' failure to act or otherwise proceed in good faith has led Circle L to the brink of financial ruin, and the Insurance Companies now try to improperly use the arbitration provision as a sword to defeat the equitable relief they forced Circle L to seek in the Florida Case. For this, this Court should recognize, as is likewise argued before the Florida Court, that the Insurance Companies have waived the right to arbitrate the issues before this Court. In any event, this Court should permit the Florida Court to hear and determine the Injunction Motion that Circle L seeks in order to preserve the relevance and integrity of any future arbitration proceeding pertaining to this matter.

### *A Finding Of Waiver Is Warranted*

Federal Courts have long balanced the following axioms regarding arbitration: (i) "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration" Moses H. Cone Mem'l Hosp. v. Mercury Construction Corp., 460 U.S. 1 (1983), (ii) "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Communications Workers of Am., 475 U.S. 643, 648 (1986), and (iii) the right to arbitrate may be waived by the conduct of a party to the contract. Kramer v. Hammond, 943 F.2d 176, 179 (2d Cir.1991). The determination of whether a party waived its right

to arbitration is controlled solely by federal law.  *See* Huber, Hunt & Nichols, Inc. v. Architectural Stone Co., 625 F.2d 22, 25 & n. 8 (5th Cir.1980); E.C. Ernst, Inc. v. Manhattan Constr. Co., 551 F.2d 1026, 1040 (5th Cir.1977), *cert. denied sub nom.* Providence Hosp. v. Manhattan Constr. Co., 434 U.S. 1067 (1978).

In light of these considerations, it is well settled law that notwithstanding the benefits of alternative dispute resolution, a contractual agreement to arbitrate, "just like any other contract ..., may be waived."  *See e.g.*, Burton-Dixie Corp. v. Timothy McCarthy Const. Co., 436 F.2d 405, 407 (5th Cir.1971).  In determining whether a party has waived its right to arbitrate, courts have established a fact-intensive, two-part test. First, the court will decide if, "under the totality of the circumstances," the party "has acted inconsistently with the arbitration right," and, second, it will look to see whether, by doing so, that party "has in some way prejudiced the other party."  S & H Contractors, Inc. v. A.J. Taft Coal Co., 906 F.2d 1507, 1514 (11th Cir.1990); *see also* OM Group Inc. v. Mooney, 2006 WL 68791 (M.D. Fla. 2006, J. Covington).  If waiver is found, the court will not stay pending litigation.  Id.

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, likewise provides that litigation may be stayed pending arbitration only if "the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.   The Eleventh Circuit has clarified that the term "default" carries the same meaning as "waiver."  *See* Morewitz v. West of Engl. Ship Owners Mut. Prot. & Indem. Ass'n, 62 F.3d 1356, 1365-66 n. 16 (11th Cir.1995).

In the present case, as set forth in the Declaration of Steward Wagner filed along with this response, the totality of the circumstances demonstrate a pattern of willful

conduct which necessitates finding that Defendants waived any right to submit these matters to arbitration.

Following termination of the Policy, Circle L has made numerous demands that the Insurance Companies return the Cash Collateral, but without any specific explanation, the Insurance Companies refused to return any portion of the Cash Collateral. Despite repeated requests, the Insurance Companies have not provided any explanation as to why they will not return any of the Cash Collateral, all the while with the knowledge that Circle L required these monies to continue operations.

In addition to their refusal to return the Cash Collateral, the Insurance Companies likewise refused to refund the unearned premiums and provide a premium accounting to Circle L. This despite the Insurance Companies' express acknowledgement that these monies would be, or already had been, returned. When Circle L reported the Insurance Companies' conduct to the Florida Office of Insurance Regulation ("FOIR"), the Insurance Companies falsely represented to FOIR in a filing made on October 29, 2007 that the unearned premium in the amount of $760,073 will be paid to Circle L's premium finance company. This is simply not true. In fact, it was not until January 31, 2008, after Circle L filed suit in Florida, that the Insurance Companies delivered to the premium finance company the sum of $576,161.56.

What is most egregious is that while they were falsely representing the status of monies due Circle L, the Insurance Companies were well aware that Circle L's business was and is suffering a significant financial downturn and critical cash flow shortage. The refusal by the Insurance Companies to return the Cash Collateral has put Circle L at great risk that its ongoing business operations will fail, and Circle L will be irreparably harmed

if the Cash Collateral is not returned immediately.  Not once during this time period did

the Insurance Companies indicate that there was a dispute between the parties which

would be subject to arbitration, or otherwise delay the return of Circle L's property.  The

simple fact is that there is no dispute, just a course of conduct meant to delay the turnover

of Circle L's property for the financial benefit of the Insurance Companies.  The conduct

of the Insurance Companies in this regard is deplorable, and is wholly inconsistent with a

good faith effort to arbitrate matters genuinely in dispute.

### *Defendants' Conduct Has Prejudiced Plaintiff*

As a result of the foregoing conduct, Circle L has been significantly prejudiced.

Prejudice refers to the inherent unfairness in terms of delay, expense, or damage to a

party's legal position that occurs when a party acts inconsistently with a purported right

to arbitrate.  S & R Co. of Kingston v. Latona Trucking, Inc., 159 F.3d 80 (2d Cir. 1998),

*cert. dismissed*, 528 U.S. 1058 (1999).  When determining whether the other party has

been prejudiced, a court may consider the length of delay in demanding arbitration and

the expense incurred by that injured party as a result of the delay.  *See* Frye v. Paine,

Webber, Jackson & Curtis, Inc., 877 F.2d 396, 399 (5th Cir.1989), *cert. denied*, 494 U.S.

1016 (1990).

Prejudice is found in situations where the party seeking arbitration allows the

opposing party to undergo the types of costs and expenses that arbitration was designed

to alleviate.  E.C. Ernst, Inc. v. Manhattan Constr. Co., 559 F.2d 268, 269 (5th Cir.1977),

cert. denied, 434 U.S. 1067 (1978).  As noted above, wholly inconsistent with the policy

arbitration is designed to further, the Insurance Companies undertook to hinder, delay,

and obstruct Circle L's right to receive its own property following the termination of the

contract between them.  The result of the Insurance Companies' conduct has been to place Circle L at the precipice of financial ruin.  Circle L has sunk deeper and deeper into debt, and has been forced to seek emergency funding at terms which are highly unfavorable to Circle L.  In addition, Circle L's reputation among its customers and its suppliers has been damaged, and continues to deteriorate as a result of its cash shortage.  That Circle L has been prejudiced cannot be disputed.  In sum, the only hope for survival is immediate injunctive relief by the Florida Court.

### *Whether Or Not  These Matters Go To Arbitration, This Court Should Nonetheless Permit The Florida Court To Hear And Determine Circle L's Motion For Preliminary Injunctive Relief*

Even if it is determined that the issues currently before the Florida Court are subject to arbitration in New York, this ruling would have no effect upon the Florida Court's right to grant pre-arbitration injunctive relief, which is wholly appropriate in this case.  If the Florida Court determines that preliminary injunctive relief is warranted, it could both grant the relief and stay further proceedings in the Florida Case pending the outcome of the determination of arbitrability, and potentially arbitration, before this Court.

In cases where arbitration may be compelled pursuant to the Federal Arbitration Act, a district court is empowered to grant preliminary injunctive relief pending arbitration, provided that the party seeking relief satisfies the traditional criteria required to the granting of a preliminary injunction, primarily that in the absence of injunctive relief, the complaining party will suffer or will continue to suffer irreparable injury, for which that party has no adequate remedy at law.  Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dunn, 191 F.Supp.2d 1346, 1350 (M.D. Fla. 2002)("[e]ven though [Defendant's]

agreement specifies that all disputes shall be settled by arbitration, this Court has the authority to issue an injunction pending arbitration . . . to ensure that the parties get a meaningful arbitration of their dispute.").

A grant of preliminary injunctive relief pending arbitration may be particularly appropriate and furthers the congressional purpose behind the FAA, where otherwise the process of arbitration would be rendered meaningless or a "hollow formality" because the arbitral award, when eventually rendered, could not return the parties substantially to the *status quo ante*. Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373 (6th Cir. 1995).

Thus, it has been recognized that pre-arbitral court orders are often necessary "to protect the integrity of the applicable dispute resolution process." Ortho Pharmaceutical Corp. v. Amgen, Inc., 882 F.2d 806 (3d Cir. 1989). In Performance Unlimited for example, evidence that a licensor of children's books would be unable to operate its business and would become insolvent without the payment of royalties from the publisher established the need for a preliminary injunction pending the arbitration of a dispute under the licensing agreement, requiring that the publisher pay royalties while a dispute over whether either party had breached the licensing agreement was being arbitrated. Similarly, in the Florida Case, in light of the financial condition of Circle L, which position Circle L would not be in but for the Insurance Companies' inexcusable conduct, this Court should permit the Florida Court to hear and decide the motion for injunctive relief to Circle L regardless of the issues of arbitration, because the denial of such relief would render arbitration meaningless. Proceeding in any vein without injunctive relief will likely result in the imminent financial collapse of Circle L. The benefits of

arbitration, to the extent this matter is arbitrable at all, will be lost.

### *The Plain Language Of The FAA Suggests This Court Lacks Jurisdiction To Stay The Action Pending In The Middle District of Florida*

Pursuant to the Order, this Court has directed Respondent to address whether this Court has the authority to stay the action pending in the Middle District of Florida. Respondent suggests that the plain language of the FAA provides that only the Middle District of Florida may stay its own proceeding.  Specifically, the relevant portion of the FAA provides:

> "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, ***the court in which such suit is pending***, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration. [Emphasis added]

9 U.S.C. §3.  Based upon the clear and unambiguous language of this statute, the federal court sitting in the Middle District of Florida, as the original court adjudicating this matter, has exclusive jurisdiction to stay the case filed therein.

WHEREFORE, Circle L respectfully requests that the Court enter an Order recognizing that the United States District Court for the Middle District of Florida has the authority to hear and determine Circle L's Motion for Preliminary Injunctive Relief, denying the Insurance Companies' Petition to Compel Arbitration, and grant such other relief as this Court deems just.

Dated:  New York, New York
         February 7, 2008


                        Respectfully submitted,


                        _Marc Gottlieb_
                        _____
                        MARC S. GOTTLIEB (MSG-1007


                        Law Offices of Marc S. Gottlieb
                        One Liberty Plaza, 46th Floor
                        New York, New York  10006
                        (212) 531-8276 (telephone)
                        (866) 294-0074 (facsimile)
                        Email: beilttog@yahoo.com

                                AND

                        Michael P. Brundage
                        Florida Bar No. 611621
                        Andrew W. Lennox
                        Florida Bar No. 937681
                        Jennis Bowen & Brundage, P.L.
                        400 North Ashley Drive, Suite 2540
                        Tampa, FL  33602
                        Tel: 813-229-1700
                        Fax: 813-229-1707
                        mbrundage@jennisbowen.com
                        alennox@jennisbowen.com
                        COUNSEL FOR RESPONDENT

## <u>CERTIFICATE OF SERVICE</u>

MARC S. GOTTLIEB, hereby Certifies that a true and correct copy of the foregoing has been furnished by filing via CM/ECF, via electronic mail and/or by regular U.S. Mail to: Michael S. Davis and Anthony I. Giacobbe, Jr., Zeichner Ellman & Krause, LLP, 575 Lexington Avenue, New York, NY 10022 on this 7th day of February, 2008.

_____
MARC S. GOTTLIEB (MSG-1007



American International Companies®
**DBG Legal Services**
**Consumer Complaints Department**
175 Water Street, 17th Floor
New York, NY 10038
E-mail: consumer@aig.com

October 2⁰, 2007

State of Fl rida
Financial Services Departraent
Division of Consumer Ser/ices
200 East Caines Street
Tallahasse?, Florida 32399-0322
**Attn: Reb ecca Blackburr**

Re    Complainar t:      Steward D. Wagner
      Insured:           Circle L Roofing Inc.
      Insurance Carrier: American Home Assurance Company
      NAIC:              19380
      Your File No.:     1-384488641
      Policy No.:        WC 717 98 93
      Our File No.:      FL AHAC 07 16115

Dear Ms. Blackburn:

On behalf of American Ho:ne Assurance Company ("AHAC"), we respectfully submit
this letter n response to the above-referenced consumer complaint filed by Steward
Wagner on behalf of our Insured Circle L Roofing Inc. ("Complainant"), with the State of
Florida Financial Services Department. Complainant seeks clarification regarding a
return premium on his cancelled Workers' Compensation policy.

This complaint arises out of Complainant's allegations of undue delay of receiving his
premium refund of his cancelled Workers' Compensation policy, WC 717 98 93 effective
11/1/06-0'. Complainant contends that effective July 1, 2007, he requested that his
policy be cancelled. On July 9, 2007, AHAC received the request to cancel the policy.
This was AHAC's first notice that the Complainant wished to cancel the policy. AHAC
immediately notified all the necessary parties of the cancellation and worked to get the
cancellation and audit proc:ssed. On July 17, 2007, the cancellation was processed. The
premium audit was processed on July 25, 2007.

Subsequer t to the policy cancellation, AHAC was notified that there was a premium
finance agreement covering the subject policy as well as two other policies issued to the
Complain.int during that period. The premium audit for these three policies resulted in a
return premium of $760,073.00 and accordingly, a return premium in the amount of
$760,073. 10 will be issued to the finance company involved. Based on Florida Statute

69 FL ADC 690-196.010, "a premium finance company shall be responsible to refund to
the insured any money due or held on the insured's behalf within 30 days of receipt of the
funds from the insurer."

We trust we have satisfactorily responded to your inquiry. Should you have any
questions or need anything further from us, please do not hesitate to contact the
undersigned at 212-458-7078.

Sincerely,

*Monica Esreira*

Monica Esreira
Complain Analyst
DBG Legal Services
Monica.Esreira@aig.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AMERICAN HOME ASURANCE COMPANY,      Case No. 8: cv-0874-RJS

     Petitioner,

vs.

CIRCLE L. ROOFING, INC.,

     Respondent.

_____/

### DECLARATION OF STEWARD WAGNER IN OPPOSITION
### TO PETITION TO COMPEL ARBITRATION

Pursuant to 28 U.S.C section 1746, STEWARD WAGNER, declares as follows:

1.      I am Steward Wagner. I am over 21 years of age, and am competent and authorized to make this declaration.

2.      I am the chief financial officer of Circle L Roofing, Inc. ("Circle L") and am the person from Circle L who is primarily responsible for arranging for and dealing with worker's compensation insurance for Circle L's employees as well as other insurances.

3.      I have personal knowledge of all of the statements made within this affidavit.

4.      Circle L is a licensed roofing contractor that conducts business solely within the State of Florida.

5.      Beginning in 2004, Circle L entered into certain insurance contracts in the State of Florida with American International Group, Inc. ("AIG") and American Home

Assurance Company ("AHA") (collectively, the "Insurance Companies"), including contracts providing for the following coverage: (i) workers compensation; (ii) general liability; (iii) automobile; (iv) umbrella; (v) crime; and (vi) inland marine.

6.    Pursuant to the insurance contracts for worker's compensation coverage, the Insurance Companies required that Circle L provide collateral for deductible loss reimbursements and premiums that may be owed to the Insurance Companies under worker's compensation policies from time to time. Initially, Circle L satisfied this collateral requirement by posting letters of credit in favor of the Insurance Companies.

7.    In December 2006, Circle L and National Union Fire Insurance Company of Pittsburgh Pa, on behalf of the Insurance Companies, entered into an agreement entitled "Incurred Loss Payments Plan." A copy of the Incurred Loss Payments Plan is attached to this declaration as **Exhibit "A"**.

8.    Pursuant to the Incurred Loss Payments Plan, specifically Section "C" titled "Security Plan," Circle L provided cash collateral to the Insurance Companies comprised of the following: (i) a previously escrowed amount of $82,694; (ii) cash in the amount $2,250,000 drawn by Circle L from a  line of credit; and (iii) seven (7) cash payments over a six-month period totaling $2,225,856. The total cash collateral provided by Circle L to the Insurance Companies under the Incurred Loss Payments Plan was $4,558,550 (the "Cash Collateral").

9.    Circle L fully performed under its contractual agreement with the Insurance Companies. I am not aware of any claim or allegation made orally or in writing by the Insurance Companies that Circle L did anything other than fully perform its contractual duties and obligations with the Insurance Companies.

{00085999.DOC;1}

10.     During the term of the last worker's compensation policy issued to Circle

L by the Insurance Companies effective November 1, 2006 (the "Policy") (Exhibit "B),

Circle L raised a number of concerns regarding the Insurance Companies' miscalculation

of premiums and funding requirements, including concerns that premiums and funding

requirements were calculated by the Insurance Companies based upon grossly

exaggerated estimates of Circle L's expected payroll.

11.     After trying unsuccessfully to resolve these issues and concerns from

January of 2007 until June of 2007, Circle L had no choice but to terminate the Policy

according to its terms on July 1, 2007. Upon termination of the Policy, Circle L was

entitled to have the Cash Collateral returned to it.

12.     Circle L has made numerous demands that the Insurance Companies

return the Cash Collateral, but without any specific explanation, the Insurance Companies

have refused to return any portion of the Cash Collateral. I understand that due to certain

payments made from the Cash Collateral, the balance of Circle L's cash held by the

Insurance Companies is approximately $3,600,000. The Insurance Companies have not

provided any explanation as to why they will not return any of the Cash Collateral. In

fact, the Insurance Companies have represented to me that their maximum exposure for

potential losses is only $225,000, but they still refuse to return even the undisputed

portion of the Cash Collateral.

13.     After termination of the Policy, Circle L was also entitled to a refund of

the unearned premiums. Circle L's entitlement to the unearned premium refund was

acknowledged by the Insurance Companies through an audit that they conducted. In fact,

the Insurance Companies at various times represented to me over a seven month period of

{00085999.DOC;1}

time that the unearned premium refund was "on the way" or had already been sent. Although the Insurance Companies continually represented to me that the unearned premium was in the process of being refunded, to that date without any explanation no refund has been made. I reported to the Florida Office of Insurance Regulation ("FOIR") the unexcused failure of the Insurance Companies to refund the unearned premium and an investigation file was opened. This file was later closed because the Insurance Companies represented to FOIR in a filing made on October 29, 2007 that the unearned premium in the amount of $760,000.73 had been paid to Circle L's premium finance company. This is not true. I have now learned that the premium finance company received $576,161.56 on January 31, 2008 after Circle L sued the Insurance Companies in Florida.

14.    Circle L's business has and continues to suffer a significant financial downturn and critical cash flow shortages. The refusal by the Insurance Companies to return the Cash Collateral has put Circle L at great risk that its ongoing business operations will fail and Circle L will be irreparably harmed if the Cash Collateral is not returned immediately.

15.    The Insurance Companies continual representations that the refund issues were being resolved induced Circle L to not take any action until December 2007 when Circle L had no choice but to file suit in federal court in Tampa, Florida. During the intervening time, Circle L's financial condition and cash flow problems continued to worsen, leaving Circle L no choice but to seek injunctive relief from the District Court in Florida.

{00085999.DOC;1}

## THIS CONCLDUES MY DECLARATION

DATED $2 \cdot 6 \cdot 08$

ŠTEWARD WAGNER

# EXHIBIT A
## Wagner Declaration
### *Incurred Loss Payments Plan*

# Schedule of Policies and Payments

## Incurred Loss Payments Plan

Effective from 11/01/2006 to 11/01/2007

Annexed to the PAYMENT AGREEMENT

effective on <u>11/01/2006</u>

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**
**American International Pacific Insurance Company**
**Granite State Insurance Company**
**Landmark Insurance Company**
**National Union Fire Insurance Company of Louisiana**
**New Hampshire Insurance Company**

and *You*, our Client

**CIRCLE L ROOFING INC**
**9009 TOWN CENTER PARKWAY**
**BRADENTON   FL  34202-5132**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: **653151**

**EXHIBIT "A"**

## List of Addressees for Notices and Other Purposes

**Your Address:**

**Contact Name:**
**Company Name:** CIRCLE L ROOFING INC
**Street:** 9009 TOWN CENTER PARKWAY
**City:** BRADENTON     **State:** FL     **Zip:** 34202-5132 **Phone:** (941) 907-7240

**Your Representative:**

**Contact Name:** Connie Harding
**Company Name:** HILB ROGAL HAMILTON INSURANCE
**Street:** 7000 CENTRAL PARKWAY # 700
**City:** ATLANTA     **State:** GA     **Zip:** 30328     **Phone:** (404) 942-5122

**Our Account Executive:**

**Contact Name:** E. R. Sanders, CPCU
**Company Name:** American International Group
**Street:** 1200 Albernathy Road Building 600
**City:** Atlanta     **State:** GA     **Zip:** 30328     **Phone:** 770 671 2284

**Our Law Representative:**

**Contact Name:** Peter H. Recksett
**Company Name:** American International Group
**Street:** 160 Water Street
**City:** New York     **State:** NY     **Zip:** 10037     **Phone:** 212 820 4540

**Remit Payments to:**

**Contact Name:**
**Company Name:** American International Companies
**Street:** PO Box 10472
**City:** Newark     **State:** NJ     **Zip:** 07193     **Phone:**

**Remit Collateral to:**

**Contact Name:** Attn: Mr. Donato DiLuzio
**Company Name:** American International Group Inc.
**Street:** P.O.Box 923 Wall Street Station
**City:** New York     **State:** NY     **Zip:** 10268     **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**     **State:**     **Zip:**     **Phone:**

**Contact Name:**
**Company Name:**
**Street:**
**City:**     **State:**     **Zip:**     **Phone:**

Incurred Loss Payments Method
10/31/2006 004/02 9464916

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

**WC 7179893.**

Commercial General Liability Insurance

**GL 1792226.**

Automobile Liability Insurance

**CA 8262535.**

Other Insurance (describe):

Other Agreements (Describe)

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 11/01/2006 | $2,342,318 | $0 | $7,500 | $0 | $2,349,818 |
| | Subtotals | $2,342,318 | $0 | $7,500 | $0 | $2,349,818 |
| | DLP* | N/A | N/A | N/A | $2,225,856 | $2,225,856 |
| | DEP* | $0 | $0 | $0 | N/A | $0 |
| | Totals | $2,342,318 | $0 | $7,500 | $2,225,856 | $4,575,674 |

**DLP** means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Additional Payments" described below.

**DEP** means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

**Notes**   (1) "Provision for Expenses and Excess Losses" is a part of the Premium. The remainder of the Premium is included under "Provision for Limited Losses".

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

*You* must pay us the installment amounts by the due dates as specified in Section B.1. We have calculated the part of those installments designated as "Provision for Limited Losses" to equal the *Losses* within *Your Retention* and *Your* share of *ALAE* that we expect to incur during the period for which Provision for Limited Losses amounts are shown in Section B.1. For the purposes of this *Schedule*, the amount we incur will be the sum of the amounts we pay and the amounts we reserve for payment on claims that have been reported to us, but shall not include our reserves for *Losses* that have been incurred but have not been reported to us.

By the end of that period,

- we will determine the actual amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we have incurred under the *Policies*, and

- **if we have incurred more** for *Loss* within *Your Retention* and *Your* share of *ALAE* under the *Policies* than the sum that *You* have paid us as Provision for Limited Losses, *You* must upon our demand pay us the difference, or

- **if we have incurred less** for *Loss* within *Your Retention* and *Your* share of *ALAE* under the *Policies* than the sum that *You* have paid us as Provision for Limited Losses, we will credit the difference against *Your* subsequent obligation to pay us as described below; and

- we will calculate the amount of *Losses* within *Your Retention* and *Your* share of *ALAE* that we expect to incur during the next annual period. We will notify *You* of the due date and amount of each subsequent payment due us during the next annual period.

We will repeat this procedure at the end of each subsequent annual period until Conversion.

**Billing Method:**
    ☒ Billing to
        ☒*You* at *Your* address shown in the *Schedule*, or
        ☐*Your* Representative at its address shown in the *Schedule*; or
    ☐ Automatic Withdrawal from the account described below.

If Automatic Withdrawal Account applies: Minimum Amount:
Name of Depository Institution:
Address:
Account Number:

## 4. Conversion

**The Conversion Date** for each *Policy* described in section A above shall be the date **18** months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

# C. Security Plan

## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| Escrow | $82,694 |
| LOCs | $2,250,000 |
| **Total Collateral on Hand** | $2,332,694 |

| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| Cash Security (Cash Collateral) | $556,464 | 2006-11-01 |
| Cash Security (Cash Collateral) | $278,232 | 2006-12-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-01-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-02-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-03-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-04-01 |
| Cash Security (Cash Collateral) | $278,232 | 2007-05-01 |
| **Total Additional Collateral Required** | **$2,225,856** | |

| Total Collateral Required | $4,558,550 |
| --- | --- |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a.  Credit Trigger:

    i.  If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

    ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

*Name of Entity:  Type of Debt Rated:*

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
| --- | --- | --- |
|  |  |  |
|  |  |  |
|  |  |  |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
| --- | --- | --- |
|  |  |  |
|  |  |  |

b.  Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery. Adjustment of the credit fee shall not include an adjustment of any fees associated with your deferred premium payment plan.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.**, on behalf of itself and all its affiliates,

this ____ day of _____, **2006**

Signed by _____

Typed Name __Geoffrey Hall__

Title __Authorized Representative__

For You: **CIRCLE L ROOFING INC**

this _1st_ day of _DECEMBER_ _2006_

Signed by _____

Typed Name _JEFFREY J. LYNN_

Title _PRESIDENT_

**EXHIBIT B**
**Wagner Declaration**
*Policy*

ISSUED BY THE STOCK INSURANCE COMPANY HEREIN CALLED THE COMPANY

AMERICAN HOME ASSURANCE COMPANY
13781

AGENT NUMBER
78116-0000

POLICY NUMBER
WC  717-98-93
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-00

INCORPORATED UNDER THE LAWS OF   NEW YORK
ITEM 1.   NAMED INSURED:   MAILING ADDRESS   IDENTIFICATION NO.:

CIRCLE L ROOFING INC
9009 TOWN CENTER PARKWAY
BRADENTON, FL 34202-5132

**AIG** Member Companies of
American International Group

EXECUTIVE OFFICES:
70 PINE STREET, NEW YORK, N.Y. 10270

SEE NAME AND ADDRESS SCHEDULE - WC990610
ID# 09749885        FL UI#:

PRODUCER'S NAME AND ADDRESS

## WORKERS COMPENSATION AND EMPLOYERS LIABILITY POLICY INFORMATION PAGE

HILB ROGAL & HOBBS OF FLORIDA INC
6771 PROFESSIONAL PKWY W
SARASOTA, FL 34240-8460

INSURED IS
CORPORATION

PREVIOUS POLICY NUMBER
RENEWAL        001361319

OTHER WORKPLACES NOT SHOWN ABOVE: SEE NAME AND ADDRESS SCHEDULE - WC990610

| ITEM 2 | POLICY PERIOD 12:01 A.M. standard time at the insured's mailing address | FROM 11/01/06 | TO 11/01/07 |
|---|---|---|---|

ITEM 3   A. Workers Compensation Insurance: Part One of the policy applies to the Workers Compensation Law of the states listed here:

FL

B. Employers Liability Insurance: Part Two of the policy applies to the work in each state listed in Item 3.A.
The limits of our liability under Part Two are:

Bodily Injury by Accident $    500,000   each accident
Bodily Injury by Disease $    500,000   policy limit
Bodily Injury by Disease $    500,000   each employee

C. Other States Insurance: Part Three of the policy applies to the states, if any, listed here:
AK AL AR AZ CA CO CT DC DE GA HI IA ID IL IN KS KY LA MA MD ME MI MN MO MS MT NC NE NH
NJ NM NV NY OK OR PA RI SC SD TN TX UT VA VT WI

ITEM 4   The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans.
All information required below is subject to verification and change by audit.

| Classifications | Code Number | Estimated Total Remuneration [X] Annual [ ] 3 Year | Rate Per $100 OF Remuneration | Estimated Premium [X] Annual [ ] 3 Year |
|---|---|---|---|---|
| SEE EXTENSION OF INFORMATION PAGE - WC7754 | | | | |

EXPENSE CONSTANT (EXCEPT WHERE APPLICABLE BY STATE)        $200 FL
MINIMUM PREMIUM        $1,000 FL

If indicated below, interim adjustments of premium shall be made:

TOTAL ESTIMATED PREMIUM        $1,257,006

[ ] Semi-Annually    [ ] Quarterly    [ ] Monthly

ENDORSEMENTS (FORM NUMBER)    SEE ATTACHED FORM SCHEDULE - WC990612

DEPOSIT PREMIUM        $1,257,006

12/19/06 ATLANTA
Issue Date
9887

07
Issuing Office

Authorized Representative    WC 00 C0 01

INSURED'S COPY

**EXHIBIT "B"**

# WORKERS COMPENSATION AND EMPLOYERS LIABILITY

## INSURANCE POLICY

National Union Fire Insurance
Company of Pittsburgh, Pa.

American Home Assurance Company

The Insurance Company of
The State of Pennsylvania

Birmingham Fire Insurance Company
of Pennsylvania

Commerce and Industry
Insurance Company



Member Companies of
American International Group, Inc.
EXECUTIVE OFFICES
70 PINE STREET
NEW YORK, N.Y. 10270

Coverage is provided by the Company designated on the Information Page
A Stock Insurance Company

## WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY
### QUICK REFERENCE

|  | BEGINNING ON PAGE |
|---|---|
| Information Page | i |
| **GENERAL SECTION** | 1 |
| A. The Policy | 1 |
| B. Who is Insured | 1 |
| C. Workers Compensation Law | 1 |
| D. State | 1 |
| E. Locations | 1 |
| **PART ONE—WORKERS COMPENSATION INSURANCE** | 1 |
| A. How This Insurance Applies | 1 |
| B. We Will Pay | 1 |
| C. We Will Defend | 1 |
| D. We Will Also Pay | 1 |
| E. Other Insurance | 1 |
| F. Payments You Must Make | 2 |
| G. Recovery From Others | 2 |
| H. Statutory Provisions | 2 |

THESE POLICY PROVISIONS WITH THE INFORMATION PAGE AND ENDORSEMENTS,
IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THIS POLICY.

"INCLUDES COPYRIGHT MATERIAL OF THE NATIONAL COUNCIL ON COMPENSATION
INSURANCE, USED WITH ITS PERMISSION.

COPYRIGHT 1983 NATIONAL COUNCIL ON COMPENSATION INSURANCE"

39838C(04/92)

# QUICK REFERENCE – CONTINUED

BEGINNING ON
PAGE

PART TWO - EMPLOYERS LIABILITY INSURANCE ...................................................................2
    A. How This Insurance Applies ...........................................................................2
    B. We Will Pay ...................................................................................................3
    C. Exclusions ......................................................................................................3
    D. We Will Defend ..............................................................................................3
    E. We Will Also Pay ...........................................................................................4
    F. Other Insurance ............................................................................................4
    G. Limits of Liability ...........................................................................................4
    H. Recovery From Others ..................................................................................4
    I. Action Against Us ..........................................................................................4

PART THREE - OTHER STATES INSURANCE .........................................................................4
    A. How This Insurance Applies ..........................................................................4
    B. Notice ............................................................................................................5

PART FOUR - YOUR DUTIES IF INJURY OCCURS ..................................................................5

PART FIVE - PREMIUM ........................................................................................................5
    A. Our Manuals .................................................................................................5
    B. Classifications ...............................................................................................5
    C. Remuneration ...............................................................................................5
    D. Premium Payments ......................................................................................5
    E. Final Premium ...............................................................................................5
    F. Records .........................................................................................................6
    G. Audit ............................................................................................................6

PART SIX - CONDITIONS .....................................................................................................6
    A. Inspection ......................................................................................................6
    B. Long Term Policy ..........................................................................................6
    C. Transfer of Your Rights and Duties ...............................................................6
    D. Cancellation ..................................................................................................6
    E. Sole Representative .......................................................................................6

IMPORTANT: This Quick Reference is **not** part of the Workers Compensation and Employers Liability Policy and does **not** provide coverage. Refer to the Workers Compensation and Employers Liability Policy itself for actual contractual provisions.

## PLEASE READ THE WORKERS COMPENSATION AND EMPLOYERS LIABILITY POLICY CAREFULLY

INSURED'S COPY

ATTACH FORM AND ENDORSEMENTS (IF ANY) HERE

## WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

In return for the payment of the premium and subject to all terms of this policy, we agree with you as follows.

## GENERAL SECTION

### A.  The Policy

This policy includes at its effective date the Information Page and all endorsements and schedules listed there. It is a contract of insurance between you (the employer named in Item 1 of the Information Page) and us (the insurer named on the Information Page). The only agreements relating to this insurance are stated in this policy. The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.

### B.  Who Is Insured

You are insured if you are an employer named in Item 1 of the Information Page. If that employer is a partnership, and if you are one of its partners, you are insured, but only in your capacity as an employer of the partnership's employees.

### C.  Workers Compensation Law

Workers Compensation Law means the workers or workmen's compensation law and occupational disease law of each state or territory named in Item 3.A. of the Information Page. It includes any amendments to that law which are in effect during the policy period. It does not include any federal workers or workmen's compensation law, any federal occupational disease law or the provisions of any law that provide nonoccupational disability benefits.

### D.  State

State means any state of the United States of America, and the District of Columbia.

### E.  Locations

This policy covers all of your workplaces listed in Items 1 or 4 of the Information Page; and it covers all other workplaces in Item 3.A states unless you have other insurance or are self-insured for such workplaces.

## PART ONE - WORKERS COMPENSATION INSURANCE

### A.  How This Insurance Applies

This workers compensation insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1.  Bodily injury by accident must occur during the policy period.

2.  Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

### B.  We Will Pay

We will pay promptly when due the benefits required of you by the workers compensation law.

### C.  We Will Defend

We have the right and duty to defend at our expense any claim, proceeding or suit against you for benefits payable by this insurance. We have the right to investigate and settle these claims, proceedings or suits.

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance.

### D.  We Will Also Pay

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim, proceeding or suit we defend:

1.  reasonable expenses incurred at our request, but not loss of earnings;

2.  premiums for bonds to release attachments and for appeal bonds in bond amounts up to the amount payable under this insurance;

WC 00 00 00 A

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

### E. Other Insurance

We will not pay more than our share of benefits and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that may apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance will be equal until the loss is paid.

### F. Payments You Must Make

You are responsible for any payments in excess of the benefits regularly provided by the workers compensation law including those required because:

1. of your serious and willful misconduct;

2. you knowingly employ an employee in violation of law;

3. you fail to comply with a health or safety law or regulation; or

4. you discharge, coerce or otherwise discriminate against any employee in violation of the workers compensation law.

If we make any payments in excess of the benefits regularly provided by the workers compensation law on your behalf, you will reimburse us promptly.

### G. Recovery From Others

We have your rights, and the rights of persons entitled to the benefits of this insurance, to recover our payments from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

### H. Statutory Provisions

These statements apply where they are required by law.

1. As between an injured worker and us, we have notice of the injury when you have notice.

2. Your default or the bankruptcy or insolvency of you or your estate will not relieve us of our duties under this insurance after an injury occurs.

3. We are directly and primarily liable to any person entitled to the benefits payable by this insurance. Those persons may enforce our duties; so may an agency authorized by law. Enforcement may be against us or against you and us.

4. Jurisdiction over you is jurisdiction over us for purposes of the workers compensation law. We are bound by decisions against you under that law, subject to the provisions of this policy that are not in conflict with that law.

5. This insurance conforms to the parts of the workers compensation law that apply to:

   a. benefits payable by this insurance or;

   b. special taxes, payments into security or other special funds, and assessments payable by us under that law.

6. Terms of this insurance that conflict with the workers compensation law are changed by this statement to conform to that law.

Nothing in these paragraphs relieves you of your duties under this policy.

## PART TWO - EMPLOYERS LIABILITY INSURANCE

### A. How This Insurance Applies

This employers liability insurance applies to bodily injury by accident or bodily injury by disease. Bodily injury includes resulting death.

1. The bodily injury must arise out of and in the course of the injured employee's employment by you.

2. The employment must be necessary or incidental to your work in a state or territory listed in Item 3.A. of the Information Page.

3. Bodily injury by accident must occur during the policy period.

4. Bodily injury by disease must be caused or aggravated by the conditions of your employment. The employee's last day of last exposure to the conditions causing or aggravating such bodily injury by disease must occur during the policy period.

5. If you are sued, the original suit and any related legal actions for damages for bodily injury

WC 00 00 00 A

by accident or by disease must be brought in the United States of America, its territories or possessions, or Canada.

B. **We Will Pay**

We will pay all sums you legally must pay as damages because of bodily injury to your employees, provided the bodily injury is covered by this Employers Liability Insurance.

The damages we will pay, where recovery is permitted by law, include damages:

1. for which you are liable to a third party by reason of a claim or suit against you by that third party to recover the damages claimed against such third party as a result of injury to your employee;

2. for care and loss of services; and

3. for consequential bodily injury to a spouse, child, parent, brother or sister of the injured employee;

provided that these damages are the direct consequence of bodily injury that arises out of and in the course of the injured employee's employment by you; and

4. because of bodily injury to your employee that arises out of and in the course of employment, claimed against you in a capacity other than as employer.

C. **Exclusions**

This insurance does not cover:

1. liability assumed under a contract. This exclusion does not apply to a warranty that your work will be done in a workmanlike manner;

2. punitive or exemplary damages because of bodily injury to an employee employed in violation of law;

3. bodily injury to an employee while employed in violation of law with your actual knowledge or the actual knowledge of any of your executive officers;

4. any obligation imposed by a workers compensation, occupational disease, unemployment compensation, or disability benefits law, or any similar law;

5. bodily injury intentionally caused or aggravated by you;

6. bodily injury occurring outside the United States of America, its territories or possessions, and Canada. This exclusion does not apply to bodily injury to a citizen or resident of the United States of America or Canada who is temporarily outside these countries;

7. damages arising out of coercion, criticism, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination against or termination of any employee, or any personnel practices, policies, acts or omissions.

8. bodily injury to any person in work subject to the Longshore and Harbor Workers' Compensation Act (33 USC Sections 901-950), the Nonappropriated Fund Instrumentalities Act (5 USC Sections 8171-8173), the Outer Continental Shelf Lands Act (43 USC Sections 1331-1356), the Defense Base Act (42 USC Sections 1651-1654), the Federal Coal Mine Health and Safety Act of 1969 (30 USC Sections 901-942), any other federal workers or workmen's compensation law or other federal occupational disease law, or any amendments to these laws.

9. bodily injury to any person in work subject to the Federal Employers' Liability Act (45 USC Sections 51-60), any other federal laws obligating an employer to pay damages to an employee due to bodily injury arising out of or in the course of employment, or any amendments to those laws.

10. bodily injury to a master or member of the crew of any vessel.

11. fines or penalties imposed for violation of federal or state law.

12. damages payable under the Migrant and Seasonal Agricultural Worker Protection Act (29 USC Sections 1801-1872) and under any other federal law awarding damages for violation of those laws or regulations issued thereunder, and any amendments to those laws.

D. **We Will Defend**

We have the right and duty to defend, at our expense, any claim, proceeding or suit against you for damages payable by this insurance. We have the right to investigate and settle these claims, proceedings and suits.

WC 00 00 00 A

We have no duty to defend a claim, proceeding or suit that is not covered by this insurance. We have no duty to defend or continue defending after we have paid our applicable limit of liability under this insurance.

E. **We Will Also Pay**

We will also pay these costs, in addition to other amounts payable under this insurance, as part of any claim proceeding, or suit we defend;

1. reasonable expenses incurred at our request; but not loss of earnings;

2. premiums for bonds to release attachments and for appeal bonds in bond amounts up to the limit of our liability under this insurance;

3. litigation costs taxed against you;

4. interest on a judgment as required by law until we offer the amount due under this insurance; and

5. expenses we incur.

F. **Other Insurance**

We will not pay more than our share of damages and costs covered by this insurance and other insurance or self-insurance. Subject to any limits of liability that apply, all shares will be equal until the loss is paid. If any insurance or self-insurance is exhausted, the shares of all remaining insurance and self-insurance will be equal until the loss is paid.

G. **Limits of Liability**

Our liability to pay for damages is limited. Our limits of liability are shown in Item 3.B. of the Information Page. They apply as explained below.

1. Bodily Injury by Accident. The limit shown for "bodily injury by accident-each accident" is the most we will pay for all damages covered by this insurance because of bodily injury to one or more employees in any one accident.

A disease is not bodily injury by accident unless it results directly from bodily injury by accident.

2. Bodily Injury by Disease. The limit shown for "bodily injury by disease-policy limit" is the most we will pay for all damages covered by this insurance and arising out of bodily injury by disease, regardless of the number of employees who sustain bodily injury by disease. The limit shown for "bodily injury by disease-each employee" is the most we will pay for all damages because of bodily injury by disease to any one employee.

Bodily injury by disease does not include disease that results directly from a bodily injury by accident.

3. We will not pay any claims for damages after we have paid the applicable limit of our liability under this insurance.

H. **Recovery From Others**

We have your rights to recover our payment from anyone liable for an injury covered by this insurance. You will do everything necessary to protect those rights for us and to help us enforce them.

I. **Actions Against Us**

There will be no right of action against us under this insurance unless:

1. You have complied with all the terms of this policy; and

2. The amount you owe has been determined with our consent or by actual trial and final judgment.

This insurance does not give anyone the right to add us as a defendant in an action against you to determine your liability. The bankruptcy or insolvency of you or your estate will not relieve us of our obligations under this Part.

## PART THREE - OTHER STATES INSURANCE

A. **How This Insurance Applies**

1. This other states insurance applies only if one or more states are shown in Item 3.C. of the Information Page.

2. If you begin work in any one of those states after the effective date of this policy and are not insured or are not self-insured for such work, all provisions of the policy will apply as

though that state were listed in Item 3.A. of the Information Page.

3. We will reimburse you for the benefits required by the workers compensation law of that state if we are not permitted to pay the benefits directly to persons entitled to them.

4. If you have work on the effective date of this policy in any state not listed in Item 3.A. of the

**WC 00 00 00 A**

Information Page, coverage will not be afforded for that state unless we are notified within thirty days.

**B. Notice**

Tell us at once if you begin work in any state listed in Item 3.C. of the Information Page.

## PART FOUR - YOUR DUTIES IF INJURY OCCURS

Tell us at once if injury occurs that may be covered by this policy. Your other duties are listed here.

1. Provide for immediate medical and other services required by the workers compensation law.

2. Give us or our agent the names and addresses of the injured persons and of witnesses, and other information we may need.

3. Promptly give us all notices, demands and legal papers related to the injury, claim, proceeding or suit.

4. Cooperate with us and assist us, as we may request, in the investigation, settlement or defense of any claim, proceeding or suit.

5. Do nothing after an injury occurs that would interfere with our right to recover from others.

6. Do not voluntarily make payments, assume obligations or incur expenses, except at your own cost.

## PART FIVE - PREMIUM

**A. Our Manuals**

All premium for this policy will be determined by our manuals of rules, rates, rating plans and classifications. We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

**B. Classifications**

Item 4 of the Information Page shows the rate and premium basis for certain business or work classifications. These classifications were assigned based on an estimate of the exposures you would have during the policy period. If your actual exposures are not properly described by those classifications, we will assign proper classifications, rates and premium basis by endorsement to this policy.

**C. Remuneration**

Premium for each work classification is determined by multiplying a rate times a premium basis. Remuneration is the most common premium basis. This premium basis includes payroll and all other remuneration paid or payable during the policy period for the services of:

1. All your officers and employees engaged in work covered by this policy; and

2. All other persons engaged in work that could make us liable under Part One (Workers Compensation Insurance) of this policy. If you do not have payroll records for these persons, the contract price for their services and materials may be used as the premium basis. This paragraph 2 will not apply if you give us proof

that the employers of these persons lawfully secured their workers compensation obligations.

**D. Premium Payments**

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid.

**E. Final Premium**

The premium shown on the Information Page, schedules, and endorsements is an estimate. The final premium will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy. If the final premium is more than the premium you paid to us, you must pay us the balance. If it is less, we will refund the balance to you. The final premium will not be less than the highest minimum premium for the classifications covered by this policy.

If this policy is canceled, final premium will be determined in the following way unless our manuals provide otherwise.

1. If we cancel, final premium will be calculated pro rata based on the time this policy was in force. Final premium will not be less than the pro rata share of the minimum premium.

2. If you cancel, final premium will be more than pro rata; it will be based on the time this policy was in force, and increased by our short rate

WC 00 00 00 A

cancellation table and procedure. Final premium will not be less than the minimum premium.

### Records

You will keep records of information needed to compute premium. You will provide us with copies of those records when we ask for them.

### G. Audit

You will let us examine and audit all your records that relate to this policy. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records, and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.

## PART SIX - CONDITIONS

### A. Inspection

We have the right, but are not obliged to inspect your workplaces at any time. Our inspections are not safety inspections. They relate only to the insurability of the workplaces and the premiums to be charged. We may give you reports on the conditions we find. We may also recommend changes. While they may help reduce losses, we do not undertake to perform the duty of any person to provide for the health or safety of your employees or the public. We do not warrant that your workplaces are safe or healthful or that they comply with laws, regulations, codes or standards. Insurance rate service organizations have the same rights we have under this provision.

### B. Long Term Policy

If the policy period is longer than one year and sixteen days, all provisions of this policy will apply as though a new policy were issued on each annual anniversary that this policy is in force.

### C. Transfer of Your Rights and Duties

Your rights or duties under this policy may not be transferred without our written consent.

If you die and we receive notice within thirty days after your death, we will cover your legal representative as insured.

### D. Cancellation

1. You may cancel this policy. You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2. We may cancel this policy. We must mail or deliver to you not less than ten days advance written notice stating when the cancellation is to take effect. Mailing that notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

3. The policy period will end on the day and hour stated in the cancellation notice.

4. Any of these provisions that conflicts with a law that controls the cancellation of the insurance in this policy is changed by this statement to comply with that law.

### E. Sole Representative

The insured first named in Item 1 of the Information Page will act on behalf of all insureds to change this policy, receive return premium, and give or receive notice of cancellation.

WC 00 00 00 A

In Witness Whereof, the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned by a duly authorized representative of the company.

The Insurance Company
of The State of Pennsylvania

President
National Union Fire
Insurance Company of
Pittsburgh, PA

President
Commerce and Industry
Insurance Company

President
American Home
Assurance Company

President
Birmingham Fire Insurance
Company of Pennsylvania

Secretary
National Union Fire Insurance Company of Pittsburgh, PA
American Home Assurance Company
The Insurance Company of The State of Pennsylvania
Birmingham Fire Insurance Company of Pennsylvania
Commerce and Industry Insurance Company

WC 00 00 00 A                    7 of 7

INSURED'S COPY

# FORMS SCHEDULE
## POLICY ENDORSEMENT SCHEDULE

Policy Number: WC  717-98-93                          Effective Date:  11/01/2006

| | |
|---|---|
| FORTRSM | FOREIGN TERRORISM POLHOLDR NOT-PREM DTMN |
| WC000302 | DESIGNATED WORKPLACES EXCLUSION ENDT |
| WC000313 | WAIVER OF OUR RIGHT TO RECOVER |
| WC000406 | PREMIUM DISCOUNT ENDORSEMENT |
| WC000414 | NOTIFICATION OF CHANGE IN OWNERSHIP ENDT |
| WCOFAC | NOTICE REG OFFICE OF FOREIGN ASSET CTRL |
| WC090606 | FL EMPLOYMENT AND WAGE INFO RELEASE ENDT |
| 78052C | PRIVACY POLICY |
| WC000419 | PREMIUM DUE DATE ENDORSEMENT |
| WC090303 | FLORIDA EMPLOYERS LIABILITY COVERAGE END |
| WC090403 | FL TERRORISM RISK INSURANCE EXT ACT ENDT |
| WC990903 | FL CANCELLATION AND NONRENEWAL ENDT |
| WC990905 | FLORIDA LOSS REIMBURSEMENT ENDT |
| WC990906 | FL 90D ADV NTC OF CANC OR NON-REN BY US |
| WC990911 | FLORIDA ADDENDUM TO THE DECLARATIONS |
| WC990610 | NAMED INSUREDS/ADDRESSES |

**WC 99 06 12**
**(Ed. 1/97)**

INSURED'S COPY

## STANDARD WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY EXTENSION FORM

| WC   717-98-93 | FLORIDA | 09749885 |
|---|---|---|
| Policy Prefix & No. | Schedule | INTRA/Independent State Risk ID |
| 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-00 | CIRCLE L ROOFING INC | |

### Item 4. Classification of Operations

Entries in this item, except as specifically provided elsewhere in this policy, do not modify any of the other provisions of this policy.

| | | Code No. | Premium Basis — Estimated Total Annual Remuneration | Rates — Per $100 of Remuneration | Estimated Annual Premium |
|---|---|---|---|---|---|
| RATING GROUP:  0001-01 | | | | | |
| SHEET METAL WORK-SHOP | | 3066 | 100,000 | 11.33 | 11,330 |
| ROOFING: ALL KINDS & DRIVERS. | | 5551 | 19,500,000 | 35.40 | 6,903,000 |
| CONTRACTOR-EXECUTIVE SUPERVISOR OR CONSTRUCTION SUPERINTENDENT | | 5606 | 1,750,000 | 3.84 | 67,200 |
| SALESPERSONS, COLLECTORS, OR MESSENGERS-OUTSIDE. | | 8742 | 1,250,000 | 1.00 | 12,500 |
| CLERICAL OFFICE EMPLOYEES NOC. | | 8810 | 3,450,000 | 0.58 | 20,010 |
| STATE OF FLORIDA TOTALS | | | | | |
| TOTAL CLASSIFICATION PREMIUM | | | | | 7,014,040 |
| BLANKET WAIVER | | 0930 | | | 140,281 |
| INCREASE LIMITS | 0.80% | 9807 | | | 57,235 |
| SAFETY PROGRAM | -2.00% | 9765 | | | -144,231 |
| TOTAL UNMODIFIED PREMIUM | | | | | 7,067,325 |
| EXPERIENCE PREMIUM    (ACTUAL) | 0.5700 | 9898 | | | -3,038,950 |
| MODIFIED STANDARD PREMIUM | | | | | 4,028,375 |
| CONTRACTORS RATING PLAN | -15.00% | 9046 | | | -604,256 |
| UNDISCOUNTED PREMIUM | | | | | 3,424,119 |
| LOSS REIMB PLAN (NON-FEDERAL) | -58.37% | 9864 | | | -1,998,658 |
| PREMIUM DISCOUNT | -6.70% | 0064 | | | -229,416 |
| DISCOUNTED PREMIUM | | | | | 1,196,045 |
| TAX PROVISION IN PREMIUM | 4.10% | 9719 | | | 49,038 |
| EXPENSE CONSTANT | | 0900 | | | 200 |
| FOREIGN TERRORISM (TRIA) | 0.045 | 9740 | | | 11,723 |
| TOTAL ESTIMATED PREMIUM | | | | | 1,257,006 |
| TOTAL DUE | | | | | 1,257,006 |
| EXPERIENCE RATING MODIFICATION = 0.57 | | | | | |

WC 7754 (Ed. 4-81)        **See Name and Address Schedule – WC990610**

INSURED'S COPY

## FOREIGN TERRORISM (TRIA) POLICYHOLDER NOTICE - PREMIUM DETERMINATION

As indicated in Form No. WC 00 04 22, your Foreign Terrorism (TRIA) premium is shown in Form WC 7754. The schedule below shows how the premium for Foreign Terrorism (TRIA) is determined.

### Schedule

| State | Premium Determination Method |
|---|---|
| Arizona ............................................................................... | Rate per $100 of Remuneration in addition to rate included in Arizona premium as set forth below**. |
| Colorado, Connecticut, Florida, New Jersey, New Mexico and Wisconsin .............................................................................. | Rate per $100 of Remuneration. |
| New York ............................................................................. | Rate per $100 of Remuneration and rate applied to Total Classification Premium. |
| Idaho, Kansas, Maine, New Hampshire and Virginia ............... | Included in Rates applied to Premium Basis (Remuneration) for calculation of annual premium for each applicable classification of operations. |
| Alabama, Alaska, Arkansas, Iowa, Montana, Nevada, Tennessee and Texas ............................................................. | Rate per $100 of Remuneration in addition to charge included in rates applied to Premium Basis (Remuneration) for calculation of annual premium for each applicable classification of operations. |
| All Other States ................................................................... | Rate applied to Total Classification Premium. |

Refer to Item 4 of the Information Page and State Schedule Pages form WC 7754 for the premium charged for the coverage provided for workers' compensation losses caused by an act of foreign terrorism. This premium is included in your Total Estimated Premium and is an estimate. The final premium for this coverage will be determined after this policy ends by using the actual, not the estimated, premium basis and the proper classifications and rates that lawfully apply to the business and work covered by this policy.

The rates and rating methodologies used to calculate the premium charged for this coverage are subject to change. This means that the rates and rating methodologies applied when your policy was issued may be different from those applied when computing your premium after the issuance of the policy, for example, at time of audit

** For policies issued by Commerce and Industry Insurance Company, AIU Insurance Company or New Hampshire Insurance Company the total premium for Arizona also includes a charge for this coverage in the rates applied to Premium Basis (Remuneration) for each applicable classification of operations.

For policies issued by American Home Assurance Company, American International South Insurance Company, Birmingham Fire Insurance Company of Pennsylvania, Granite State Insurance Company, Illinois National Insurance Co., National Union Fire Insurance Company of Pittsburgh, Pa. or The Insurance Company of the State of Pennsylvania the total premium for Arizona also includes a charge for this coverage determined by applying a rate against the Schedule Modification factor.

FORTRSM
(Ed. 01/06)

INSURED'S COPY

## DESIGNATED WORKPLACES EXCLUSION ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM 11/01/2006          forms a part of Policy No. WC     717-98-93

Issued to CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY

The policy does not cover work conducted at or from:

ANY WORK PERFORMED BY OR ON BEHALF OF YOU UNDER ANY OWNER
CONTROLLED INSURANCE PROGRAM (O.C.I.P.) OR CONTRACTORS
INSURANCE PROGRAM (C.C.I.P.) OTHER WISE REFERRED TO AS A
WARP UP PROGRAM THAT YOU ENTER INTO.

WC 00 03 02
(Ed. 4-84)

Countersigned by _____          _____

**Authorized Representative**

INSURED'S COPY

## WAIVER OF OUR RIGHT TO RECOVER FROM OTHERS ENDORSEMENT

This endorsement changes the policy to which it is attached effective on inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM 11/01/2006        forms a part of Policy No. WC    717-98-93

Issued to CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY

Premium

We have the right to recover our payments from anyone liable for an injury covered by this policy. We will not enforce our right against the person or organization named in the Schedule. This agreement applies only to the extent that you perform work under a written contract that requires you to obtain this agreement from us.

This agreement shall not operate directly or indirectly to benefit any one not named in the Schedule.

### Schedule

ANY PERSON OR ORGANIZATION TO WHOM YOU BECOME
OBLIGATED TO WAIVE YOUR RIGHTS OF RECOVERY
AGAINST, UNDER ANY CONTRACT OR AGREEMENT YOU ENTER
INTO PRIOR TO THE OCCURRENCE OF LOSS.

This form is not applicable in California, Kentucky, New Hampshire, New Jersey, North Dakota, Ohio, Tennessee, Texas, Utah, Washington, or West Virginia.

WC 00 03 13
(Ed. 04/84)            Countersigned by _____    _Boyd A Dahl_

Authorized Representative

## PREMIUM DISCOUNT ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006          forms a part of Policy No. WC    717-98-93

Issued to CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY

The premium for this policy and the policies, if any, listed in Item 3 of the Schedule may be eligible for a discount.  This endorsement shows your estimated discount in Items 1 or 2 of the Schedule.  The final calculation of premium discount will be determined by our manuals and your premium basis as determined by audit.  Premium subject to retrospective rating is not subject to premium discount.

Schedule

|  | | First $5,000 | Estimated Eligible Premium | | |
|---|---|---|---|---|---|
| 1. | State | | Next $95,000 | Next $400,000 | Balance |
| | Florida | | 3.50 | 5.00 | 7.00 |

2. Average percentage discount:                              6.70  %

3. Other policies: TBD

4. If there are no entries in Items 1, 2 and 3 of the Schedule, see Premium Discount Endorsement attached to your policy number:

WC 00 04 06
(Ed. 4-84)                    Countersigned by _____          *[signature]*

                                                                            Authorized Representative

INSURED'S COPY

## NOTIFICATION OF CHANGE IN OWNERSHIP ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006          forms a part of Policy No. WC    717-98-93

Issued to CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY

Experience rating is mandatory for all eligible insureds. The experience rating modification factor, if any, applicable to this policy, may change if there is a change in your ownership or in that of one or more of the entities eligible to be combined with you for experience rating purposes. Change in ownership includes sales, purchases, other transfers, mergers, consolidations, dissolutions, formations of a new entity and other changes provided for in the applicable experience rating plan manual.

You must report any change in ownership to us in writing within 90 days of such change. Failure to report such changes within this period may result in revision of the experience rating modification factor used to determine your premium.

THIS ENDORSEMENT IS NOT APPLICABLE IN NEW JERSEY, PENNSYLVANIA, CALIFORNIA, DELAWARE OR TEXAS.

WC 00 04 14
(Ed. 07/90)

Countersigned by _____

Authorized Representative

INSURED'S COPY

# IMPORTANT NOTICE TO OUR CUSTOMERS
## REGARDING THE
## OFFICE OF FOREIGN ASSETS CONTROL

our rights as a policyholder and payments to you, any insured, additional insured, loss payee, mortgagee, or claimant, or loss under this policy may be affected by the administration and enforcement of U.S. economic embargoes and trade sanctions by the OFFICE OF FOREIGN ASSETS CONTROL ("OFAC").

## WHAT IS OFAC?

OFAC is an office of the Department of the Treasury and acts under presidential wartime and national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze foreign assets under U.S. jurisdiction. OFAC administers and enforces economic embargoes and trade sanctions primarily against:

* Targeted foreign countries and their agents

* Terrorism sponsoring agencies and organizations

* International narcotics traffickers

## PROHIBITED ACTIVITY

* OFAC enforces certain embargoes and sanctions against certain designated countries. No U.S. business or person may enter into certain transactions in or connected to such designated "sanctioned" countries.

* OFAC maintains a directory known as the "Specially Designated Nationals and Blocked Persons" ("SDNBP") list. No U.S. business or person may transact business with any person or entity named on the SDNBP list.

Additional and more in-depth information on OFAC is available at the following website: http://www.ustreas.gov/offices/eotffc/ofac.

## OBLIGATIONS PLACED ON US BY OFAC

we determine that you or any insured, additional insured, loss payee, mortgagee, or claimant are on the SDNBP list or e connected to a sanctioned country as described in the regulations enforced by OFAC, we must block or "freeze" property and payment of any funds transfers or transactions and report all blocks to OFAC within ten (10) days.

## POTENTIAL ACTIONS BY US

1. We may immediately cancel your coverage effective on the day that we determine that we have transacted business with an individual or entity associated with your policy on the SDNBP list or connected to a sanctioned country as described in the regulations enforced by OFAC.

2. If we cancel your coverage, you will not receive a return premium unless approved by OFAC. All funds will be placed in an interest bearing blocked account established on the books of a U.S. financial institution.

3. We will not pay a claim, accept premium or exchange monies or assets of any kind to or with individuals, entities or companies (including a bank) on the SDNBP list or connected to a sanctioned country as described in the regulations enforced by OFAC. And, we will not defend or provide any other benefits under your policy to individuals, entities or companies on the SDNBP list or connected to a sanctioned country as described in the regulations enforced by OFAC.

## YOUR RIGHTS AS A POLICYHOLDER

If funds are blocked or frozen by us in conjunction with the OFFICE OF FOREIGN ASSETS CONTROL, you may complete an "APPLICATION FOR THE RELEASE OF BLOCKED FUNDS" and apply for a specific license to request their release. Forms are available for download at the OFAC website. See http://www.ustreas.gov/offices/eotffc/ofac/legal/forms/license.pdf

**WCOFAC**
**(Ed. 07/05)**

## FLORIDA EMPLOYMENT AND WAGE INFORMATION RELEASE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006          forms a part of Policy No. WC   717-98-93

Issued to CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY

This policy requires you to release certain employment and wage information maintained by the State of Florida pursuant to federal and state unemployment compensation laws except to the extent prohibited or limited under federal law. By entering into this policy, you consent to the release of the information.

We will safeguard the information and maintain its confidentiality. We will limit use of the information to verifying compliance with the terms of the policy.

WC 09 06 06
(Ed. 10/98)

Countersigned by _____

Authorized Representative

INSURED'S COPY

**PRIVACY POLICY**

**Our Commitment to Privacy:**

The AIG Companies (AIG) believe one of our most important assets is the trust consumers place in us to respect and properly handle nonpublic personal information received by us in connection with providing our products and services. To continue earning your trust and enhance the products and services offered to you, the companies listed below have adopted the following privacy policy to govern how we treat your nonpublic personal information including such information about our former customers.

It's important for you to know that this privacy policy applies only to the product or service you have just obtained or the insurance policy under which you are seeking or receiving benefits. As a large worldwide leader in the delivery of financial products and services, we offer numerous products and services to many types of consumers and clients in many different states and countries around the world. Therefore, each of our companies may issue different privacy policies to fit the specific products and services they offer.

**Information We Collect:**

We collect information about you that is necessary to tailor our products and services to meet your individual needs, provide effective customer service, and comply with legal requirements.

We may collect nonpublic personal information about you, from one or more of the following sources:
- Information we receive from you on applications or other forms;
- Information about your transactions with us, our affiliates or others;
- Information we receive from a consumer-reporting agency; and
- Information received in handling claims.

**Sharing Information Within Our Family of Companies:**

We may share some or all of the nonpublic personal information we collect with our affiliates - the members of the AIG family of companies, unless such sharing of information is prohibited by law. In many cases, the information that is shared may be at your request or is necessary to administer, process or otherwise handle your transactions with us or settle a claim on your behalf. In addition, we may provide this information to our affiliates in order to offer you products and services in which you may be interested.

Our family of companies includes many insurance companies (e.g., auto, home, and life insurance), insurance claims handling companies, other financial institutions (e.g., savings bank), and non-financial institutions.

**Sharing Information Outside the AIG Family:**

Sometimes, we use companies or businesses outside the AIG family to administer, process, or otherwise handle your transactions with us, such as for claims handling or customer service. Other times, we may enter into contracts with nonaffiliated companies to perform services on our behalf, such as marketing our products and services, or we may enter into joint marketing agreements with other financial institutions. In these and other circumstances permitted by law, we may share some or all of the information we collect above with these nonaffiliated third parties. However, whenever we utilize a nonaffiliated third party to provide these services, they are required to follow federal privacy laws governing this notice. We also may share information to combat fraud, in response to a court order, or at the request of government regulators.

**Nonpublic Personal Health Information:**

We will not disclose nonpublic personal health information about you without obtaining prior written authorization from you, except as permitted by applicable law or regulation.

78052C
(Ed. 11/05)

INSURED'S COPY

**Protecting and Safeguarding Your Information:**

To help prevent unwarranted disclosure of your nonpublic information and secure it from theft, we utilize secure computer networks and restrict access to nonpublic personal information about you to those employees who need to know that information to provide products or services to you. In addition, we maintain physical, electronic, and procedural safeguards that comply with applicable laws and regulations to guard our customers' nonpublic personal information.

**Maintaining Accurate Information:**

We also maintain procedures to ensure that the information we collect is accurate, up-to-date, and as complete as possible. If you believe the information we have about you in our records or files is incomplete or inaccurate, you may request that we make additions or corrections, or if it is feasible, that we delete this information from our files. You may make this request in writing to (include your name, address and policy number):

Chief Privacy Officer
AIG - Domestic Brokerage Group
175 Water Street, 3rd Floor
New York, NY 10038

FAX: 212-785-9495

e-mail: DBG.Privacy@AIG.com

*Special notice for policyholders who reside in any of the following states: Arizona, California, Connecticut, Georgia, Illinois, Kansas, Maine, Massachusetts, Minnesota, Montana, Nevada, New Jersey, North Carolina, Ohio, Oregon, Virginia or Wisconsin: You can obtain access to any nonpublic personal information we have about ou if you properly identify yourself and submit a written request to us at the address above describing the information you want to review (include your name, address and policy number). Once we have received your request, and if the information is reasonably locatable and retrievable, we will, within 30 business days, take the following actions:*

- *Inform you of the nature and substance of the recorded information;*
- *Allow you to see and copy, in person, such recorded personal information; or*
- *Send you a copy of the recorded personal information by mail (we may charge you a reasonable fee to cover the cost of this service).*

*We will also tell you at this time the identity, if recorded, of persons to whom we have disclosed the nonpublic personal information within the preceding two years.*

*If you ask us to correct, amend or delete any information about you, we will, within 30 business days, either correct, amend or delete the nonpublic personal information in dispute or notify you of our refusal to take such action along with the reasons for our decision. If we make the correction, amendment or deletion you've requested, we will also notify you along with any person you designate who has received the information about you within the preceding two years, together with any insurance support organization(s) which provided us with the disputed information.*

*If we refuse to make the requested correction, amendment or deletion, you are permitted to file a concise statement setting forth what you think is the correct, relevant or fair information along with a statement of the reasons why you disagree with our refusal to correct, amend or delete the information subject to dispute. We will file your statement with the disputed personal information and make any person who reviews your file aware of your statement. We will also furnish your statement to any person who has received personal information from us within the two preceding years and any insurance support organization whose primary source of personal information is an insurer.*

78052C
(Ed. 11/05)

INSURED'S COPY

**Important Information Concerning the Applicability and Future Changes to this Privacy Policy:**

his privacy policy applies, with respect to nonpublic personal financial information, to products or services provided primarily for personal, family, or household purposes in the United States by the AIG Companies listed below, and it applies to all nonpublic personal health information these Companies may have. Although we may change this policy at any time, please rest assured that you will be notified of any changes as required by law.

**AIG Companies Covered by this Policy:**

AIG Hawaii Insurance Company
AIU Insurance Company
American Home Assurance Company
American International Pacific Insurance Company
American International South Insurance Company
Birmingham Fire Insurance Company of Pennsylvania
Commerce and Industry Insurance Company
Granite State Insurance Company
Illinois National Insurance Co.
National Union Fire Insurance Company of Louisiana
National Union Fire Insurance Company of Pittsburgh, Pa.
New Hampshire Insurance Company
The Insurance Company of the State of Pennsylvania
American International Specialty Lines Insurance Company
American Pacific Insurance Company, Inc.
Landmark Insurance Company
Lexington Insurance Company
Agency Management Corporation
A. I. Risk Specialists Insurance, Inc.
A. I. Risk Specialists of Missouri, Inc.
American International Entertainment, Inc.
Eastern Risk Specialists, Inc.
Florida Risk Specialists, Inc.
The Gulf Agency, Inc.
Louisiana Risk Specialists, Inc.
Medical Excess Insurance Services, Inc.
Michigan Risk Specialists, Inc.
Midwestern Risk Specialists, Inc.
Nevada Risk Specialists, Inc.
New England Risk Specialists, Inc.
Northwestern Risk Specialists, Inc.
Risk Specialists Companies, Inc.
Risk Specialists Company (Bermuda), Ltd.
Risk Specialists Company of Colorado, Inc.
Risk Specialists Company of Kentucky, Inc.
Risk Specialists Company of Minnesota, Inc.
Risk Specialists Company of New Jersey, Inc.
Risk Specialists Company of New York, Inc.
Risk Specialists Company of Ohio, Inc.
Risk Specialists of the Carolinas, Inc.
Southeastern Risk Specialists, Inc.
Southern Risk Specialists, Inc.
Western Risk Specialists, Inc.
American International Surplus Lines Agency, Inc.
AIG Warranty Services and Insurance Agency, Inc.

and other member companies of the AIG family who sent you this privacy policy statement.

78052C
(Ed. 11/05)

INSURED'S COPY

## PREMIUM DUE DATE ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   11/01/2006        forms a part of Policy No. WC    717-98-93

Issued to  CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY

### PART FIVE
### PREMIUM

D.    **Premium** is amended to read:

You will pay all premium when due. You will pay the premium even if part or all of a workers compensation law is not valid. **The due date for audit and retrospective premiums is the date of the billing.**

WC 00 04 19
(Ed. 01/01)

Countersigned by _____

Authorized Representative

INSURED'S COPY

WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY            WC 09 03 03

(Ed. 8-05)

## FLORIDA EMPLOYERS LIABILITY COVERAGE ENDORSEMENT

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The Information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement 11/01/2006  Effective Policy No. WC    717-98-93                Endorsement No.
Insured CIRCLE L ROOFING INC                                               Premium $

Insurance Company AMERICAN HOME ASSURANCE COMPANY

C.  Exclusion 5, Section C. of Part Two of the policy, is replaced by following:

This insurance does not cover

5.  bodily injury intentionally caused or aggravated by you or which is the result of your engaging in conduct equivalent to an intentional tort, however defined, or other tortious conduct, such that you lose your immunity from civil liability under the workers compensation laws.

Countersigned by _____

_____

INSURED'S COPY

**Authorized Representative**

## FLORIDA TERRORISM RISK INSURANCE EXTENSION ACT ENDORSEMENT

This endorsement changes the policy to which it is attached and is effective on the date issued unless otherwise stated.

**(The information below is required only when this endorsement is issued subsequent to preparation of the policy.)**

Endorsement 11/01/2006  Effective Policy No. WC   717-98-93          Endorsement No.
Insured CIRCLE L ROOFING INC                                         Premium $

Insurance Company AMERICAN HOME ASSURANCE COMPANY

This endorsement addresses requirements of the Terrorism Risk Insurance Act of 2002 as amended by the Terrorism Risk Insurance Extension Act of 2005.

### Definitions

The definitions provided in this endorsement are based on the definitions in the Act and are intended to have the same meaning. If words or phrases not defined in this endorsement are defined in the Act, the definitions in the Act will apply.

1. "Act" means the Terrorism Risk Insurance Act of 2002, which took effect on November 26, 2002, and any amendments resulting from the Terrorism Risk Insurance Extension Act of 2005.

2. "Act of terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States as meeting all of the following requirements:

   a. The act is an act of terrorism.

   b. The act is violent or dangerous to human life, property or infrastructure.

   c. The act resulted in damage within the United States, or outside of the United States in the case of United States missions or certain air carriers or vessels.

   d. The act has been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Insured terrorism or war loss" means any loss resulting from an act of terrorism (including an act of war, in the case of workers compensation) that is covered by primary or excess property and casualty insurance issued by an insurer if the loss occurs in the United States or at United States missions or to certain air carriers or vessels.

4. "Insurer deductible" means:

   a. For the period beginning on January 1, 2006 and ending on December 31, 2006, an amount equal to 17.5% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2006.

   b. For the period beginning January 1, 2007 and ending on December 31, 2007, an amount equal to 20% of our direct earned premiums, as provided in the Act, over the calendar year immediately preceding January 1, 2007.

5. "Program Year 4" means the period beginning on January 1, 2006 and ending on December 31, 2006.

6. "Program Year 5" means the period beginning on January 1, 2007 and ending on December 31, 2007.

### Limitation of Liability

The Act may limit our liability to you under this policy. If annual aggregate insured terrorism or war losses of all insurers exceed $100,000,000,000 during the applicable period provided in the Act, and if we have met our insurer deductible, the amount we will pay for insured terrorism or war losses under this policy will be limited by the Act, as determined by the Secretary of the Treasury.

**WC 09 04 03**
**(Ed. 01/06)**
© 2005 National Council on Compensation Insurance, Inc.


INSURED'S COPY   Page 1 of 2

**Policyholder Disclosure Notice**

1. Insured terrorism or war losses would be partially reimbursed by the United States Government under a formula established by the Act. Under this formula, the United States Government would pay 90% for Program Year 4 and 85% for Program Year 5 of our insured terrorism or war losses exceeding our insurer deductible.

2. The premium charged for the coverage this policy provides for insured terrorism or war losses is included in the amount shown in Item 4 of the Information Page or the Schedule below.

**Schedule**

Rate per $100 of Remuneration

.045

**WC 09 04 03**
**(Ed. 01/06)**
© 2005 National Council on Compensation Insurance, Inc.

Countersigned by _____



INSURED'S COPY

**Authorized Representative**

## FLORIDA CANCELLATION AND NONRENEWAL ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   11/01/2006         forms a part of Policy No. WC     717-98-93

Issued to CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY

This endorsement applies only to the insurance provided because Florida is shown in Item 3.A. of the Information Page.

This endorsement applies only to Part Six, D. Conditions, of this policy.

The Cancellation Condition of the policy is replaced by this Condition:

Cancellation

1.    You may cancel this policy.  You must mail or deliver advance written notice to us stating when the cancellation is to take effect.

2.    If we cancel this policy, we will mail or deliver to you and the State of Florida Department of Labor and Employment Security, 30 days' advance written notice stating when the cancellation is to take effect.

Nonrenewal

If we decide not to renew this policy, we will mail or deliver to you written notice of nonrenewal, accompanied by the reason for nonrenewal, at least forty-five (45) days prior to the expiration of this policy.

Any notice of cancellation or nonrenewal will be mailed or delivered to the Insured's last mailing address known to the Insurer.  If notice is mailed, proof of mailing will be sufficient proof of notice.

**WC 99 09 03**
**(Ed. 01/91)**

Countersigned by _____

_____
**Authorized Representative**

INSURED'S COPY

## FLORIDA LOSS REIMBURSEMENT ENDORSEMENT

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006        forms a part of Policy No. WC    717-98-93

Issued to C I R C L E   L   R O O F I N G   I N C

By AMERICAN HOME ASSURANCE COMPANY

**This Endorsement applies solely between you and us. It does not affect the rights of others.**

**I. Payment and Reimbursement Conditions**

**A. We will pay:**

1. all benefits and costs payable under PART ONE - WORKERS COMPENSATION INSURANCE; and

2. up to our limit of liability, all sums you legally must pay as damages and other costs to which PART TWO - EMPLOYERS LIABILITY applies; and

3. all benefits and costs payable under PART THREE - OTHER STATES INSURANCE; and

4. all benefits or damages and costs payable under any endorsements attached to the policy.

**B.** You will reimburse us promptly up to the applicable reimbursement limit shown in the Schedule for any amounts we have so paid.

**C. You will further reimburse us** promptly for the following:

1. any **"allocated loss adjusting expense"** we pay, according to one of the Options described below and selected in the Schedule. If no selection is indicated, Option A applies. Your obligation to reimburse us for "allocated loss adjusting expense" applies separately to "each accident" or, for bodily injury by disease, to "each claim".

   a) **Option A:** All "allocated loss adjusting expenses" up to the amount by which the applicable reimbursement limit exceeds the amount you must reimburse us for benefits or damages we pay.

   b) **Option B:** All "allocated loss adjusting expenses".

   c) **Option C:** A part of all "allocated loss adjusting expenses" in the proportion that the sum you must reimburse us for benefits or damages bears to all benefits and damages we pay. If we make no payment of benefits or damages, you must reimburse us for all "allocated loss adjusting expenses" we pay up to the applicable Reimbursement Amount.

   d) **Option D:** No "allocated loss adjusting expenses".

**D. Aggregate Limit:** If a Limit is shown in the Schedule as "Aggregate Limit", subject to items 1 and 2 below, that Limit is the most you must reimburse us in the aggregate for all benefits and damages and "allocated loss adjusting expenses" that we pay under this policy and the other policies described in the Schedule. If no Aggregate Limit is shown in the Schedule, no aggregate limit applies to your reimbursement obligation.

1. The Aggregate Limit (if any) shown in the Schedule is an estimate. Subject to item 2 below, the final Aggregate Limit will be determined after this policy ends by using the actual, not the estimated, Aggregate Limit Basis for all policies to which it applies and the rate shown in the Schedule.

2. The final Aggregate Limit will not be reduced if this or any other such policy is issued for a term of less than one year, or if this or any other such policy or this endorsement is canceled by you before the end of the policy period for any reason except your retirement from business.

**E.** No limit on the Company's liability under the policy or any endorsement is increased or reinstated by this endorsement or by any reimbursement to us under the terms of this endorsement.

**II. General Conditions**

**A. Duties**

1. The first Named Insured shown in the Information Page agrees and is authorized to reimburse us for any reimbursable amounts we pay on behalf of any Insureds, and to deliver to us the collateral described in Section B below.

2. Each Named Insured is jointly and severally liable for all reimbursable amounts under this policy.

3. All other terms of the policy, including those under PART FOUR of the policy ("YOUR DUTIES IF INJURY OCCURS") and those which apply to our right and duty to defend any claim, proceeding or suit against you, and our duties if injury or disease occurs, apply without change on account of this endorsement.

## FLORIDA LOSS REIMBURSEMENT ENDORSEMENT

### B. Loss Fund Deposit

In addition to the premium, you must pay us in cash at the inception of the policy the amount shown in the Schedule as the Loss Fund Deposit. We may commingle those funds with any other of our funds and use them in any lawful manner. We will have a possessory security interest in those funds. We will return the Loss Fund Deposit to you when you have paid us the premium under our offer to commute your remaining reimbursement obligations, if any, to a fixed payment of premium.

### C. Payment of Reimbursable Amounts and Delivery of Collateral

1. You must reimburse us within twenty (20) days of your receipt of an invoice from us up to the applicable reimbursement limit for any amounts that we pay as benefits or damages and for your share of the "allocated loss adjusting expense" and "unallocated loss adjusting expense".

2. You must deliver to us within thirty (30) days of the inception of this policy collateral acceptable to us in the forms and the amounts shown in the Schedule. We will have a possessory security interest in any property you deliver to us to secure such obligations. We will review the collateral as soon as practicable after the second anniversary of the inception of this policy, and annually thereafter. If we find that we require increased collateral, you will provide us such an increase within thirty (30) days of our request. If we find that we hold a surplus of collateral, we will return the surplus to you within thirty (30) days of our finding.

3. If you fail to reimburse us when due, we may liquidate any collateral in our possession and take ownership of the proceeds to the extent of all your debts to us. Any surplus of such proceeds in excess of your debt will remain in our possession as collateral until the commutation of your remaining reimbursement obligations under Paragraph D of this Section II.

### D. Cancellation

Part Six of the policy – "CONDITIONS", Section D. "Cancellation" is amended to include the following:

If you fail to reimburse us or to deliver collateral to us when due, we may cancel this policy by mailing or delivering written notice to you not less than 30 days prior to the effective date of such cancellation stating the day and hour the cancellation is to take effect. Proof of the mailing of such notice to you at your mailing address shown in Item 1 of the Information Page will be sufficient to provide notice.

### E. Commutation

Upon your request, but not earlier than the second anniversary of the inception of this policy and not more often than annually thereafter, we must offer to commute your remaining reimbursement obligations, if any, to a fixed payment of premium. We may offer such terms at any time. You will have no obligation to accept our offer.

### F. Recovery From Others

We have your rights and the rights of persons entitled to the benefits of this insurance to recover all payments, including those within your reimbursement limit, from anyone liable for the injury. You will do everything necessary to protect those rights for us and to help us enforce them.

If we recover any payment we made under this policy from anyone liable for the injury, the amount we recover will first be applied to any payments we made as benefits, damages and allocated loss adjusting expenses in excess of your reimbursement obligations, and to our expenses in obtaining the recovery. The remainder of the recovery, if any, will be applied to reduce the amount that is reimbursable by you.

### G. Unallocated Loss Adjusting Expense:

If an "unallocated loss adjusting expense" (ULAE) percentage is shown in the Schedule, an estimated provision for the "unallocated loss adjusting expense" we incur is included in the premium. We will determine the final provision in premium for "unallocated loss adjusting expense" by multiplying the ULAE percentage by the amount you must reimburse us for benefits and damages we have paid. We will recompute the premium for this insurance annually, beginning 18 months after the inception of this policy, to include the adjusted provision for ULAE. You must pay us any additional premium so computed. We will repay you any return premium so computed.

## III. Definitions

### A. "Allocated loss adjusting expense"
means claim adjusting expense allocated by us directly to particular claims. Such expenses shall include, but not be limited to, attorneys' fees for claims in suit, court costs, and other specific items of expense such as fees for medical examinations, expert testimony, laboratory, x-ray and autopsy services, stenographic services, witnesses and summonses, and copies of documents.

### B. "Unallocated loss adjusting expense"
means all claims adjusting expenses we incur other than "allocated loss adjusting expense".

### C. "Claim"
means each demand you receive for:

1. benefits required of you by the Workers' Compensation law, including a filing by your employee or by others legally entitled to do so on his or her behalf for such benefits with an agency authorized by law, and suit or other proceedings brought by your employee for such benefits or damages; or

2. damages covered by this policy.

### D. "Standard Premium",
if used as the Aggregate Limit Basis, means the premium for the policies described in the Schedule to which the Aggregate Reimbursable Limit applies, determined on the basis of authorized rates and bases of premium, applicable experience modification, and applicable schedule modification. Standard Premium does not included the following items: Expense Constant; Premium Discount; any Surcharge; Credit or Discount for any Loss Reimbursement or Deductible Program; Retrospective Rating premium adjustment; or any other item.

## FLORIDA LOSS REIMBURSEMENT ENDORSEMENT

### SCHEDULE

1. Reimbursement Limits for each Accident or each Claim

| Named Insureds | States | Reimbursement Limits | | | ULAE % of Reimbursable Losses |
|---|---|---|---|---|---|
| | | Bodily Injury by Accident: each Accident | Bodily Injury by Disease: each Claim | ALAE Option | |
| SEE NAME AND ADDRESS SCHEDULE | FL | 500,000 | 500,000 | A | 100 |

2. Aggregate Reimbursement Limit

| Estimated Aggregate Limit Basis | Rate | Estimated Aggregate Reimbursement Limit |
|---|---|---|
| 26,050,000 | 15.3492 | 4,000,000 |

The Aggregate Reimbursement Limit and Estimated Aggregate Limit Basis apply to the following policies combined:

| Policy Number | Issued by |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

3. Collateral

| Type of Collateral | Amount of Collateral | Due Date |
|---|---|---|
| REFER TO PAYMENT AGREEMENT | | |

4. Loss Fund Deposit

| Loss Fund Deposit | REFER TO PAYMENT AGREEMENT |
|---|---|

Countersigned by _____

_Authorized Representative_

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM  11/01/2006          forms a part of Policy No. WC    717-98-93

Issued to CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY

## FLORIDA 90 DAY ADVANCE NOTICE OF CANCELLATION OR NON-RENEWAL BY US EXTENDED

This endorsement modifies insurance provided under the following:

WORKERS COMPENSATION AND EMPLOYERS LIABILITY INSURANCE POLICY

**PART SIX - CONDITIONS, D. - Cancellation, 2.** is deleted in its entirety and replaced with:

We may cancel or non-renew this policy. We must mail or deliver to you not less than the number of days shown below advance written notice stating when the cancellation or non-renewal is to take effect.

Except for non-payment of premium, non-payment of loss reimbursement or non-delivery of satisfactory security or collateral when due for which we will provide the advance written notice required by law, we shall not provide less than the number of days advance notice set forth below, or in the policy and endorsements attached thereto, or as required by state law.

Mailing that notice to you, at your mailing address shown in Item 1 of the Information Page will be sufficient to prove notice.

Cancellation: 90 Days

Non-Renewal: 90 Days

**WC 99 09 06**
**(Ed. 11/02)**

Countersigned by _____

INSURED'S COPY

**Authorized Representative**

## FLORIDA ADDENDUM TO THE DECLARATIONS

This endorsement changes the policy to which it is attached effective on the inception date of the policy unless a different date is indicated below.

(The following "attaching clause" need be completed only when this endorsement is issued subsequent to preparation of the policy).

This endorsement, effective 12:01 AM   11/01/2006          forms a part of Policy No. WC    717-98-93

Issued to CIRCLE L ROOFING INC

By AMERICAN HOME ASSURANCE COMPANY


**If you have questions about your insurance policy, or questions about claims relating to your insurance policy, please contact your insurer at the following:**

> American International Companies ®
> 70 Pine Street
> New York, NY  10270
> (212) 770-7000

WC 99 09 11
(Ed. 02/01)                    Countersigned by _____

                                                                          Authorized Representative

INSURED'S COPY

PAGE 1

**ENDORSEMENT**
**NAME AND ADDRESS SCHEDULE ENDORSEMENT**
This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC    717-98-93

Issued to: CIRCLE L ROOFING INC

By: AMERICAN HOME ASSURANCE COMPANY

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---------|---------------------------|------|------|
| 0001 | CIRCLE L ROOFING, INC.<br>6320 VENTURE DRIVE<br>SUITE 205<br>BRADENTON, FL 34202-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0002 | CIRCLE L ROOFING, INC.<br>6320 VENTURE DRIVE<br>SUITE 200<br>BRADENTON, FL 34202-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0003 | CIRCLE L ROOFING, INC.<br>6108 33TH STREET<br>EAST<br>BRADENTON, FL 34203-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0004 | CIRCLE L ROOFING, INC.<br>14775 NORTH NEBRASKA<br>TAMPA, FL 33613-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0005 | CIRCLE L ROOFING, INC.<br>11040 PLANTATION<br>ROAD<br>FT. MYERS, FL 33912-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0006 | CIRCLE L ROOFING, INC.<br>2705 ACE ROAD<br>ORLANDO, FL 32804-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0007 | CIRCLE L ROOFING, INC.<br>8701 SW KANSAS<br>AVE.<br>STUART, FL 34997-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |

CONTINUED NEXT PAGE

Issue Date: 12/19/06

WC990610 (Ed. 1-97)

INSURED'S COPY

PAGE 2

ENDORSEMENT
NAME AND ADDRESS SCHEDULE ENDORSEMENT

This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC   717-98-93

Issued to: CIRCLE L ROOFING INC

By: AMERICAN HOME ASSURANCE COMPANY

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---|---|---|---|
| 0008 | CIRCLE L ROOFING, INC.<br>4180 DOW ROAD<br>MELBOURNE, FL 32934-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0009 | CIRCLE L ROOFING, INC.<br>1515 COUNTY RD<br>210 W, BLDG 300<br>JACKSONVILLE, FL 32259-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0010 | CIRCLE L ROOFING, INC.<br>2383 US HIGHWAY<br>98 WEST<br>SANTA ROSA BEACH, FL 32459-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0011 | CIRCLE L ROOFING, INC.<br>7175 21ST STREET EAST<br>CENTRE PARK INDUSTRIAL<br>PARK SUBDIVISION<br>BRADENTON, FL 34202-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0012 | CIRCLE L ROOFING, INC.<br>7185 21ST STREET EAST<br>CENTRE PARK INDUSTRIAL<br>PARK SUBDIVISION<br>BRADENTON, FL 34202-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |
| 0013 | CIRCLE L ROOFING, INC.<br>2115 72ND AVENUE EAST<br>CENTRE PARK INDUSTRIAL<br>PARK SUBDIVISION<br>BRADENTON, FL 34202-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |

CONTINUED NEXT PAGE

Issue Date: 12/19/06

WC990810 (Ed. 1-97)

INSURED'S COPY

PAGE 3

**ENDORSEMENT**
**NAME AND ADDRESS SCHEDULE ENDORSEMENT**

This endorsement, effective 12:01 AM 11/01/2006

Forms a part of policy no.: WC    717-98-93

Issued to: CIRCLE L ROOFING INC

By: AMERICAN HOME ASSURANCE COMPANY

| LOC NO. | NAME AND ADDRESS SCHEDULE | FEIN | UI # |
|---------|---------------------------|------|------|
| 0014 | CIRCLE L ROOFING, INC.<br>2207 72ND AVENUE EAST<br>CENTRE PARK INDUSTRIAL<br>PARK SUBDIVISION<br>BRADENTON, FL 34202-0000<br>BUSINESS TYPE: CORPORATION<br>NAIC: 332322 | 650398270 | |

Issue Date: 12/19/06

WC980610 (Ed. 1-97)

Authorized Representative

INSURED'S COPY